John P. Scripps Newspapers, Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Docket No. 4672–62. Filed June 25, 1965.

*Jack M. Harrison,* for the petitioner.
*Paul G. Wilson,* for the respondent.

Fay, *Judge:* The respondent determined deficiencies in petitioner's income tax as follows:

| Taxable year | Deficiency |
|---|---|
| 1957 | $21,458.54 |
| 1958 | 23,226.85 |
| 1959 | 32,964.51 |

The only issue for decision is whether petitioner is subject to tax under section 531 [1] with respect to all or any part of the earnings retained by it in any of the years involved herein.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner is a corporation with principal place of business and office located at 306 Scripps Building, San Diego, Calif. Petitioner filed its Federal income tax returns for the years 1957, 1958, and 1959

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

with the district director of internal revenue, Los Angeles, Calif. Petitioner maintains its books of account and files its Federal income tax returns on an accrual basis of accounting. Petitioner came into existence under the laws of the State of California in March 1935 for the purpose of publishing a daily newspaper in Santa Ana, Calif., which it operated at a loss for 3½ years. The Santa Ana newspaper (Santa Ana Journal) was sold in December 1938, and its printing plant was disposed of.

In subsequent years petitioner acquired other California newspapers as follows: Ventura County Star-Free Press in 1936; Watsonville Register-Pajaronian in 1937 (sold December 31, 1945); and Santa Paula Chronicle in 1938 (sold January 1942). Beginning with 1946, petitioner's business activity has consisted of publishing the Ventura County Star-Free Press in Ventura, Calif., hereinafter referred to as Star-Free Press.

Star-Free Press was started as a daily newspaper by Roy Pinkerton on June 15, 1925. Pinkerton still serves as editor of the paper and is also president of petitioner.

By 1930 Star-Free Press' daily circulation had increased to 5,042; by 1940 to 7,416; by 1950 to 15,276; and by 1960 to 23,804. The growth of the area served by the newspaper is reflected by the following U.S. Census population figures:

| Year | Ventura City | Ventura County |
|---|---|---|
| 1930 | 11,603 | 43,753 |
| 1940 | 13,264 | 69,685 |
| 1950 | 16,534 | 114,647 |
| 1960 | 31,603 | 197,522 |

Star-Free Press is circulated throughout Ventura County, Calif. Petitioner is the only publisher of a daily paper in the city of Ventura but not the only publisher of a daily paper in the county of Ventura. In 1940 the newspaper moved into a building containing approximately 8,500 square feet of floor space, built especially for it under a long-term lease. A used printing press with a capacity of 32 pages was purchased and installed at the same time.

Increases in activity from 1940 to 1950 of Star-Free Press are indicated from the following comparisons of data:

| Year | Total revenue | Total circulation | Total pages printed | Total advertising inches |
|---|---|---|---|---|
| 1940 | $140,994 | 7,416 | 3,838 | 217,376 |
| 1945 | 239,000 | 10,587 | 3,160 | 284,695 |
| 1950 | 626,000 | 15,276 | 5,866 | 567,947 |

In 1954 petitioner constructed a building addition (containing 3,500 square feet) to the leased premises and added a 16-page unit to the press. In late 1957 petitioner purchased five units of a used Goss press from Detroit Free Press. The total cost of the press was approximately $160,000. In 1957 there was an equipment breakdown and for 10 days in that year Star-Free Press was published in Santa Barbara, Calif., some 30 miles away.

The following schedule discloses for each of the years 1950 through 1959 the total revenue of Star-Free Press, its average paid daily circulation, its total pages printed, and its total advertising inches:

| Year | Total revenue | Average paid daily circulation | Total pages printed | Total advertising inches |
|---|---|---|---|---|
| 1950 | $625,630.61 | 15,276 | 5,866 | 567,947 |
| 1951 | 662,986.04 | 15,348 | 5,806 | 584,346 |
| 1952 | 722,223.68 | 16,318 | 6,070 | 697,945 |
| 1953 | 802,446.90 | 17,218 | 6,316 | 642,557 |
| 1954 | 853,013.95 | 18,171 | 6,436 | 655,651 |
| 1955 | 958,029.52 | 19,010 | 6,984 | 715,404 |
| 1956 | 1,067,060.93 | 19,961 | 7,220 | 737,812 |
| 1957 | 1,126,581.55 | 20,342 | 7,464 | 749,857 |
| 1958 | 1,201,684.45 | 21,449 | 7,418 | 720,278 |
| 1959 | 1,369,725.72 | 23,182 | 7,936 | 796,813 |

For the year 1945 the net income of petitioner after Federal income taxes was $28,234.30.

The following schedule discloses for each of the years 1950 through 1959 petitioner's net income before Federal income taxes, its Federal income taxes, net income after taxes, dividend payments to shareholders, and the percentage of net earnings paid to shareholders:

| Year | Net income before Federal income taxes | Federal income taxes | Net income after taxes | Dividend payments | Percent of net earnings paid to shareholders |
|---|---|---|---|---|---|
| 1950 | $115,242.90 | $49,652.94 | $65,589.96 | $70,400 | 107.3 |
| 1951 | 148,934.09 | 92,017.54 | 56,916.55 | 38,400 | 67.4 |
| 1952 | 163,562.08 | 104,672.96 | 58,889.12 | 38,400 | 65.2 |
| 1953 | 152,180.36 | 92,971.65 | 59,208.71 | 38,400 | 64.9 |
| 1954 | 167,132.14 | 80,923.36 | 86,208.78 | 38,400 | 44.5 |
| 1955 | 210,528.66 | 103,974.90 | 106,553.76 | 38,400 | 36.0 |
| 1956 | 235,507.23 | 115,594.86 | 119,912.37 | 38,400 | 32.0 |
| 1957 | 231,239.30 | 114,708.56 | 116,530.74 | 38,400 | 33.0 |
| 1958 | 244,318.83 | 121,250.12 | 123,068.71 | 38,400 | 31.2 |
| 1959 | 304,759.30 | 151,948.55 | 152,810.75 | 38,400 | 25.1 |

Petitioner has paid dividends to its shareholders each year since 1943. One factor considered by the board of directors of petitioner in arriving at the amount of dividends to be paid is the need for expansion and improvement, and petitioner has not reached the stage where further expansion is unnecessary.

The impact the declaration of dividends may have on the major stockholder of petitioner, John P. Scripps, hereinafter referred to as

Scripps, was not considered by petitioner in determining dividend amounts. Petitioner's vice president and treasurer worked together to determine the amount of the dividends. Sixty percent of the capital stock of petitioner during the years in issue was owned by Scripps.

Irve C. Boldman, vice president of petitioner, is Scripps' financial adviser, having acted in such capacity for 31 years. Scripps' income, including dividends he had received from petitioner, was not sufficient to provide for his current living expenses during the years in issue. It was necessary for Scripps, during the years in issue, to sell some of his investments in order to pay his income taxes.

Scripps has been in the newspaper business for a long time. During this time his activities in the newspaper field reflect constant growth and expansion. During the years in issue, Scripps owned the following percentages of capital stock in the corporations listed below:

|  | Percent |
|---|---|
| Petitioner | 60 |
| Bremerton Sun Publishing Co | 100 |
| Telegram Tribune Co | 81 |
| Tulare Newspapers, Inc | 80 |
| Redding Record, Inc | 60 |
| Watsonville Newspapers, Inc | 60 |

For the years 1950 through 1959 petitioner invested the following amounts in additions to its property account:

| Year | Amount |
|---|---|
| 1950 | $20,748.50 |
| 1951 | 4,733.48 |
| 1952 | 10,569.85 |
| 1953 | 109,958.27 |
| 1954 | 124,672.35 |
| 1955 | 28,731.33 |
| 1956 | 38,828.49 |
| 1957 | 56,485.50 |
| 1958 | 133,349.98 |
| 1959 | 42,597.14 |

During the year 1962 approximately $170,000 was expended by petitioner for the purchase of building addition, typesetting machines, and additions to its printing presses; $40,000 of this sum involved the purchase of the property petitioner had leased in 1940 and upon which it held an option for which it had paid $5,000.

Petitioner's management consists of an executive committee composed of Scripps, chairman of the board; Irve C. Boldman, vice president and general counsel; and J. L. McNally, treasurer. The executive committee, occupying the same suite of offices, meets every day to discuss and conduct petitioner's business affairs. The executive com-

mittee has not recorded in the minutes or transcribed its business decisions except where required by corporate law. The executive committee acts in an informal manner. When necessary it is in a position to act fast. Although petitioner's plans for expansion after 1958 were only of an informal nature, the history of petitioner shows a constant growth by means of retained earnings.

Oxnard, another city in Ventura County, grew very rapidly during the last 20 years. Because petitioner did not have available funds to expand its service in that city, another newspaper established itself in Oxnard as a daily paper. Being in the same county and in a similar geographical location, the Oxnard competitor had an adverse effect on Star-Free Press' circulation, as Star-Free Press had a very large percentage of its subscribers located in the county, including the Oxnard area. Circulation of the paper in the county is important because advertisers want their messages communicated throughout the county.

A comparable situation presented itself in the Thousand Oaks area, as a newspaper, the Conejo News, had started there in 1958 on a weekly basis. To protect itself and obtain a foothold, petitioner began studying the situation in Ventura County, especially the area of Thousand Oaks. In 1959 plans relative to future competition were discussed. The Janss Corp. was developing an industrial park in this area, and population increases up to 70,000 by the year 1980 were anticipated. No formal written plans were developed by petitioner until the year 1960, even though petitioner was aware that it had this area to protect.

To maintain its competitive position in the industry and in carrying out its prior plan, in 1961 petitioner purchased the Conejo News, in Thousand Oaks, for $35,000. However, the publishing facilities of this newspaper were wholly inadequate, and they were disposed of for half their cost. Petitioner found it necessary to acquire property in Thousand Oaks for the location of a new plant to operate the paper it had purchased. The cost of such new plant was $455,000. Petitioner anticipated spending approximately $500,000 as part of its plan to acquire a newspaper in Thousand Oaks. Through 1963 petitioner was able to finance its operation in Thousand Oaks out of retained earnings. However, in 1964 to continue the operation there it was necessary for petitioner to borrow $300,000.

As of December 31, 1959, there were in effect four profit-sharing and increment agreements which petitioner had entered into with its following employees:

Harry Green, general business manager, born Jan. 14, 1904.
Irve C. Boldman, legal counsel and member of executive committee, born Feb. 11, 1896.

458

J. L. McNally, treasurer and member of executive committee, born Apr. 14, 1905. Harry O. Bostwick, business manager, born June 22, 1908.

An epitome of the terms of the agreements between petitioner and McNally is as follows:

*Profit-Sharing Agreement.*

(1) Petitioner obligates itself to pay a "bonus" to McNally equal to 5 percent of the net profits of Star-Free Press in excess of $21,000, plus 6 percent per annum on any new capital investment made by petitioner over and above the depreciation reserve accumulated since July 1, 1945.

(2) Net profits of Star-Free Press in substance are determined by subtracting from gross profits all expenses, such as rent, depreciation, taxes, wages, losses, etc., and all amounts disbursed for replacements of equipment and liquidation of petitioner's debts.

(3) Upon ascertaining the amount of the bonus, and after withholding tax has been deducted, 75 percent of the remainder is paid to the employee on request; the other 25 percent is retained by petitioner for the employee until $25,000 has been accumulated. Thereafter, all of the bonus is paid to the employee on request.

(4) The retained amounts draw interest at the rate of 6 percent per annum and interest is paid to the employee annually.

(5) The agreement is terminable at the will of either party.

(6) Any amounts retained by petitioner for an employee may be paid in a lump sum or in five equal annual installments, with interest at 6 percent per annum on any unpaid balance.

*Increment Agreement.*

(1) If at the date of termination of employment or of the agreement Star-Free Press has increased in value over its value as of January 1, 1950, the employee shall receive credit for 5 percent of the increase; conversely, if the value during the same interval has decreased, 5 percent of the decrease shall be deducted from the balance due the employee under the profit-sharing agreement.

(2) The fixed assets used in the publication of the said newspaper, including additional capital investment in excess of the accumulated depreciation reserve since January 1, 1950, and goodwill value shall be the only items considered in determining increase or decrease in value.

(3) The same factors existing as of January 1, 1950, shall be considered with the factors existing at the date of termination of the agreement (except in the case of Harry Green, the beginning base value is agreed to be $350,000), so that actual difference in value of the newspaper property is determined for settlement purposes.

(4) Disputes arising under the "increment" section are to be settled by arbitration.

The following data summarize variations in the agreements referred to above with respect to covered employees:

| Employee and age at Dec. 31, 1959 | Percent of net profits | Percent retained | Base amount accumulated | Beginning increment value | Percent o increase |
|---|---|---|---|---|---|
| Green (55) | 10 percent | [1] 75 | $35,000 | $350,000 | 10 |
| Boldman (63) | 5 percent over $21,000 | 25 | 25,000 | To be determined | 5 |
| McNally (54) | 5 percent over $21,000 | 25 | 25,000 | To be determined | 5 |
| Bostwick (51) | 10 percent over $21,300 | 25 | 50,000 | To be determined | 10 |

[1] Changed by oral agreement to 25 percent during the years in issue.

The avowed purpose of each of these agreements is to reward the employee for his services to petitioner.

In November 1956 petitioner's executive committee passed the following resolution:

RESOLVED that the Treasurer of this Corporation be, and he is hereby, authorized and directed to set up on the books of this Corporation a reserve account in the amount of $200,000 from the Corporation's earned surplus to provide for the Corporation's liability under said profit-sharing agreements.

On December 7, 1959, after giving additional consideration to the continued growth of petitioner and its increased liability under the profit-sharing plans, the executive committee passed the following resolution:

RESOLVED that the Treasurer of this Corporation be, and he is hereby, authorized and directed to increase the reserve account from $200,000.00 to $350,000.00 from the Corporation's earned surplus to provide for the Corporation's liability under its profit-sharing agreements.

The amount of the reserve set up on the books of account in anticipation of future liabilities arising under the increment agreements was determined by the executive committee, in part, as follows: Current profits were reviewed; historical growth of Star-Free Press, including the increase in circulation, was considered; and the fact that the newspaper had consistently produced substantial net earnings after taxes was a major factor.

From this data, and with an awareness that certain employees might be considering retirement in the next few years, amounts (the total of which equaled $350,000) were on two occasions set up on the books of account as reservations of earned surplus. The executive committee was of the opinion that the reserve was on the low side, but nevertheless reasonable.

Petitioner's books and records show the following liabilities under the aforementioned profit-sharing and increment agreements:

|  | As of Dec. 31— | | |
|---|---|---|---|
|  | 1957 | 1958 | 1959 |
| Liability under profit-sharing agreements | $72,471.50 | $80,536.50 | $87,934.79 |
| Liability under increment agreements | 200,000.00 | 200,000.00 | 350,000.00 |
| Total | 272,471.50 | 280,536.50 | 437,934.79 |

Petitioner's liability under the profit-sharing agreements is subject to exact calculation as of any date, and the amounts shown above are exact with respect to such liability. However, the determination of the exact liability under the increment agreements cannot be made prior to the termination of employment of all of the covered employees.

Telegram Tribune Co., referred to earlier as a corporation in which Scripps has a controlling interest, retired an employee in 1962. Under a profit-sharing and increment agreement similar to those discussed above, this employee is being paid approximately $40,000 over a 5-year period.

Petitioner's balance sheets for the taxable years 1957 through 1959 disclose the following:

| | Dec. 31— | | |
| --- | --- | --- | --- |
| | 1957 | 1958 | 1959 |
| **ASSETS** | | | |
| Cash on hand and in bank | $191,375.16 | $149,999.84 | $254,261.67 |
| Accounts receivable (net) | 115,784.97 | 120,457.31 | 141,203.00 |
| Notes receivable | | 50,000.00 | 74,000.00 |
| U.S. Treasury bonds | 69,723.44 | 30,000.00 | 30,000.00 |
| Inventories | 44,352.16 | 41,215.13 | 51,232.64 |
| Depreciable assets (net) | 234,199.18 | 329,554.31 | 316,963.16 |
| Land | 71,407.76 | 78,347.76 | 78,347.76 |
| Investments | | 40,024.00 | 45,824.00 |
| Prepaid expenses | 4,545.51 | 5,537.18 | 5,201.70 |
| Suspense account | 10,000.00 | 5,000.00 | 5,368.75 |
| Organization expense | 598.79 | 598.79 | 598.79 |
| Goodwill (purchased) | 34,827.17 | 34,827.17 | 34,827.17 |
| Total Assets | 776,814.14 | 885,561.49 | 1,037,828.64 |
| **LIABILITIES AND NET WORTH** | | | |
| Accounts payable (current) | 14,097.63 | 23,288.61 | 28,170.50 |
| Notes payable | 56,000.00 | 56,000.00 | 56,000.00 |
| Accrued taxes | 124,436.27 | 127,045.79 | 148,575,11 |
| Accrued payroll | 2,790.54 | 4,823.24 | 7,181.40 |
| Employee trust funds | 9,367.47 | 11,900.06 | 13,600.51 |
| Notes payable (employees' profit-sharing) | 72,471.50 | 80,536.50 | 87,934.79 |
| Reserve for liability under employees' profit-sharing agreements | 200,000.00 | 200,000.00 | 350,000.00 |
| Deferred income | 3,465.10 | 3,112.95 | 3,101.24 |
| Capital stock | 1,600.00 | 1,600.00 | 1,600.00 |
| Paid-in surplus | 98,630.80 | 98,630.80 | 98,630.80 |
| Earned surplus | 193,954.83 | 278,623.54 | 243,034.29 |
| Total liabilities and net worth | 776,814.14 | 885,561.49 | 1,037,828.64 |

Accounts receivable of petitioner, consisting primarily of advertising accounts, turned over approximately 10 times per year.

An analysis of the account "Notes receivable" appearing on petitioner's balance sheets as of December 31, 1958, and December 31, 1959, is as follows:

| | Dec. 31, 1958 | Dec. 31, 1959 |
| --- | --- | --- |
| Telegram Tribune Co.: | | |
| Note dated July 10, 1958, in the principal sum of $50,000, payable on or before 60 days from date, with interest at rate of 6 percent per annum on unpaid principal balance | $50,000 | $50,000 |
| Tulare Newspapers, Inc.: | | |
| 5 notes, 4 in the principal sum of $5,000 each, and 1 in the principal sum of $4,000; each dated June 15, 1959, payable on or before 10 years from date and bearing interest at 6 percent per annum on the unpaid principal balance | | 24,000 |
| Totals | 50,000 | 74,000 |

As stated earlier, during the years in issue Scripps owned 81 percent of the outstanding capital stock of Telegram Tribune Co., and 80 percent of the outstanding capital stock of Tulare Newspapers, Inc. When funds are available in any of the corporations "owned" wholly or in part by Scripps and there exists a need for funds in another of the "owned" corporations, the funds are loaned to the other "owned" corporation at 6-percent-per-annum interest, normally on a short-term basis. This arrangement is reciprocal among the corporations, and avoids where possible the use of bank loans. These types of loans are never used on a permanent basis. For long-term loans, resort is had to banks. Petitioner did not during the years in issue make any loans to Scripps. On the contrary, Scripps has loaned petitioner money as discussed *infra*.

An analysis of the account "U.S. Treasury bonds," appearing on petitioner's balance sheets as of December 31, 1957, 1958, and 1959, is as follows:

| | Dec. 31— | | |
| --- | --- | --- | --- |
| | 1957 | 1958 | 1959 |
| 2½-percent bonds of 1964/69, acquired April 26, 1943 | $10,000.00 | $10,000 | $10,000 |
| 2¼-percent bonds of 1956/59, acquired January 29, 1944 | [1] 10,000.00 | | |
| 2¼-percent bonds of 1956/59, acquired December 27, 1952 | [1] 29,723.44 | | |
| 2½-percent bonds of November 1961, acquired February 15, 1954 | 20,000.00 | 20,000 | 20,000 |
| Totals | 69,723.44 | 30,000 | 30,000 |

[1] Called for redemption September 15, 1958.

An analysis of the account "Investments," appearing on petitioner's balance sheets as of December 31, 1958 and 1959, is as follows:

| | Dec. 31, 1958 | Dec. 31, 1959 |
| --- | --- | --- |
| 400 shares of 5-percent preferred stock of E. W. Scripps Co | $40,024.00 | |
| 458 shares of 5-percent preferred stock of E. W. Scripps Co | | $45,824.00 |

Under the profit-sharing plans between petitioner and its key employees discussed *supra*, and with their consent, petitioner has retained each year a portion of profits due the employees, paying each employee interest at the rate of 6 percent per annum on the amount retained. Each employee reported his share of the profits as additional compensation for that year, even though retained by petitioner. The purpose of the retention was to provide the employees with security upon retirement.

To compensate for the 6-percent interest petitioner was paying these employees, it invested a portion of the retained funds in E. W. Scripps Co. preferred stock. This stock was known to have a ready market

and provided a fair return on the investment. Petitioner did not have any investments in unrelated businesses.

An analysis of the account "Suspense account," appearing on petitioner's balance sheets as of December 31, 1957, 1958, and 1959, is as follows:

| | Dec. 31— | | |
|---|---|---|---|
| | 1957 | 1958 | 1959 |
| Adella M. Dunning—10-year option to purchase real property—exercised June 30, 1962 | $5,000 | $5,000 | $5,000.00 |
| William H. Glover—option to purchase real property—exercised 1958 | 5,000 | | |
| Sta-Hi Corp.—deposit on equipment for future delivery | | | 368.75 |
| Totals | 10,000 | 5,000 | 5,368.75 |

An analysis of the account "Notes payable," appearing on petitioner's balance sheets as of December 31, 1957, 1958, and 1959, is as follows:

| Date of note | Payee | Face amount | Unpaid principal amount |
|---|---|---|---|
| Dec. 31, 1943 | Scripps | $44,000 | $40,000 |
| Dec. 31, 1943 | Scripps | 3,000 | 3,000 |
| Jan. 1, 1944 | Scripps | 3,000 | 3,000 |
| Jan. 1, 1944 | Scripps | 2,000 | 2,000 |
| Jan. 1, 1945 | Scripps | 3,000 | 3,000 |
| Dec. 31, 1957 | L. D. Coons | 5,000 | 5,000 |
| | | 60,000 | 56,000 |

Each of the foregoing notes bears interest at the rate of 6 percent per annum on the unpaid principal balance. The $44,000 note payable to Scripps is payable on or before 35 years from its date. Each of the other notes payable to Scripps is payable on or before 34 years from its date. The L. D. Coons note is payable on or before 60 days after written demand. The purpose of the loan from Coons, an employee of petitioner, was to give him a fair return and retirement security similar to the situation with the other key employees. Coons was given the opportunity to leave money with petitioner which would earn 6-percent interest and be paid back at his retirement. For this reason the loan is considered a long-term liability.

The account "Accrued taxes" appearing on petitioner's balance sheets for the years in issue consists of Federal income taxes accrued on prior years' profits, accrued payroll taxes, and Federal taxes withheld from employees' wages but not paid over at the end of the year. All amounts in the account were payable within 12 months and are classified as current liabilities.

Based on the foregoing classifications, the net working capital for the years in issue is as follows:

| | Dec. 31— | | |
| --- | --- | --- | --- |
| | 1957 | 1958 | 1959 |
| Current assets: | | | |
| Cash on hand and in bank | $191,375.16 | $149,999.84 | $254,261.67 |
| Accounts receivable (net) | 115,784.97 | 120,457.31 | 141,203.00 |
| Notes receivable | | 50,000.00 | 50,000.00 |
| U.S. Treasury bonds | 69,723.44 | 30,000.00 | 30,000.00 |
| Inventories | 44,352.16 | 41,215.13 | 51,232.64 |
| Prepaid expenses | 4,545.51 | 5,537.18 | 5,201.70 |
| Total current assets | 425,781.24 | 397,209.46 | 531,899.01 |
| Less: Current liabilities: | | | |
| Accounts payable (current) | 14,097.63 | 23,288.61 | 28,170.50 |
| Accrued taxes | 124,436.27 | 127,045.79 | 148,575.11 |
| Accrued payroll | 2,790.54 | 4,823.24 | 7,181.40 |
| Employee trust funds | 9,367.47 | 11,900.06 | 13,600.51 |
| Total current liabilities | 150,691.91 | 167,057.70 | 197,527.52 |
| Net working capital | 275,090.33 | 230,151.76 | 334,371.49 |

The ratio of current assets to current liabilities as of the three balance sheet dates is as follows:

Dec. 31, 1957 _____ 2.83 to 1
Dec. 31, 1958 _____ 2.38 to 1
Dec. 31, 1959 _____ 2.69 to 1

Petitioner's operating expenses (excluding depreciation) required an outlay of funds in the years at issue as follows:

1957 _____ $882,316.60
1958 _____ 942,532.64
1959 _____ 1,049,341.77

The accumulated earnings of petitioner were as follows for the stated years:

| TYE Dec. 31— | Accumulated earnings [1] |
| --- | --- |
| 1955 | $234,311.72 |
| 1956 | 315,824.09 |
| 1957 | 393,954.83 |
| 1958 | 478,623.54 |
| 1959 | 593,034.29 |

[1] Included is the reserve for liability under profit-sharing agreements.

Petitioner paid the following salary to Scripps during the years in issue:

| Year | Amount [1] |
| --- | --- |
| 1957 | $40,950.12 |
| 1958 | 41,655.80 |
| 1959 | 42,613.15 |

[1] A part of this salary was charged by petitioner to various other corporations in which Scripps held a controlling interest. The record does not set forth the exact amount which petitioner is charged with.

Had petitioner distributed all of its accumulated taxable income for the taxable years 1957, 1958, and 1959, and had Bremerton Sun Publishing Co., a corporation owned 100 percent by Scripps, distributed all of its accumulated taxable income for the taxable years 1957, 1958, and 1959, Scripps would have been required to pay the following additional Federal income taxes:

| Year | Amount |
| --- | --- |
| 1957 | $102, 393. 60 |
| 1958 | 108, 631. 26 |
| 1959 | 118, 443. 27 |

Scripps is a grandson of the late E. W. Scripps, and the E. W. Scripps Co. newspapers are operated in the East by cousins of Scripps. Except as stated, there is no other connection or relation between petitioner and E. W. Scripps Co.

Respondent, in accordance with section 534(b), sent petitioner notice that he intended to issue a deficiency notice for the years 1957, 1958, and 1959 based on section 531. Petitioner, in accordance with section 534(c), sent respondent a statement setting forth its grounds upon which it relies to establish that its retained earnings for the years in issue were not permitted to accumulate beyond the reasonable needs of its business.

The grounds relied upon by petitioner in its statement were as follows: The accumulations of earnings and profits by petitioner during the calendar years 1957, 1958, and 1959 were necessary—

(1) To provide for expansion of its plant and facilities;

(2) To provide for reserves to meet competition;

(3) To meet the deferred liabilities arising out of profit-sharing and increment agreements covering its key employees; and

(4) To provide needed working capital.

(5) No portion of the petitioner's earnings and profits has been loaned to or for the benefit of its shareholders.

(6) No portion of petitioner's earnings and profits has been invested in a business unrelated to that of petitioner.

(7) Petitioner paid substantial dividends during the calendar years 1957, 1958, and 1959.

The statement sets forth facts sufficient (except as to the second ground) to show the basis of the grounds relied upon.

OPINION

Respondent determined deficiencies in petitioner's income tax for the taxable years 1957, 1958, and 1959 under section 531 [2] in that peti-

---

[2] SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

(2) 38½ percent of the accumulated taxable income in excess of $100,000.

tioner was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to be accumulated instead of being distributed as a dividend.[3]  Under the present statutory provisions dealing with the accumulated earnings tax, unless petitioner can prove to the contrary by a preponderance of the evidence, the very fact that its earnings and profits were permitted to accumulate beyond the reasonable needs of its business is determinative of the proscribed purpose.[4]  However, to the extent petitioner can establish that it retained all or any part of its earnings and profits to meet the reasonable needs of its business, such amount will be allowed as a credit against its accumulated taxable income, subject to the accumulated earnings tax.[5]  It thus becomes necessary to consider whether petitioner's earnings and profits were, during the years in issue, accumulated beyond the reasonable needs of its business.  Included within this question is the necessity of determining to what extent the earnings and profits were accumulated for the reasonable needs of the business so as to give proper consideration to the credit.  *Motor Fuel Carriers, Inc.* v. *United States*, 322 F. 2d 576, 580 (C.A. 5, 1963).  Pursuant to section 537, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.

In connection with his determination, respondent sent to petitioner a notice of his intention to issue a notice of deficiency imposing the

---

[3] SEC. 532.  CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

[4] SEC. 533.  EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

[5] SEC. 535.  ACCUMULATED TAXABLE INCOME.

(a) DEFINITION.—For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in subsection (c).).

\*      \*      \*      \*      \*      \*      \*

(c) ACCUMULATED EARNINGS CREDIT.—

(1) GENERAL RULE.—For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b)(6).  For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561) for such year.

accumulated earning tax.[6]  In response to such notification, petitioner sent to respondent a statement setting forth the grounds upon which it relies to show that the accumulations of its earnings and profits were for the reasonable needs of its business.[7]

Respondent takes the position that the statement submitted by petitioner was too vague and too broad to place the burden of proof as to the reasonable needs of the business on respondent.  Petitioner, on the other hand, argues that the facts contained in the statement are sufficient to support the grounds stated.  We partially agree with petitioner.

We have carefully read the statement submitted by petitioner and after giving full consideration to the argument of respondent we are of the opinion that the statement (except as to the second ground) "does suffice to meet the general purpose and intent of the statute, and thereby to shift the burden of proof to the respondent with respect to the grounds alleged therein." *Electric Regulator Corporation*, 40 T.C. 757, 764 (1963), reversed on other grounds 336 F. 2d 339 (C.A. 2, 1964); *Factories Investment Corporation*, 39 T.C. 908, 915 (1963), affd. 328 F. 2d 781 (C.A. 2, 1964).  The allegations contained in the statement state grounds which, if true, would support a finding that the accumulation of petitioner's earnings and profits was for the reasonable needs of its business.  See sec. 1.537–2 (b) and (c), Income Tax Regs.[8]

---

[6] SEC. 534.  BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any ·part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531.  ,In the case of a notice of deficiency to which subsection (e)(2) applies and which is mailed on or before the 30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day.

[7] SEC. 534.  ,BURDEN OF PROOF.

(c) STATEMENT BY TAXPAYER.—,Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

[8] We think the following quote from *Raymond I. Smith, Inc. v. Commissioner*, 292 F. 2d 470, 475, 476 (C.A. 9, 1961), affirming 33 T.C. 141 (1959), certiorari denied 368 U.S. 948 (1961), is appropriate here:

"Congress did not want the taxing authorities to be second-guessing the responsible managers of corporations as to whether and to what extent profits should be distributed or retained, unless they [taxing authorities] were in a position to prove that their position was correct.  *Casey v. C.I.R.*, 2 Cir., 267 F. 2d 26, 30.  * * *"

Whether a corporation has permitted its earnings and profits to accumulate beyond its reasonable needs and whether it was availed of for the purpose of avoiding the income tax with respect to its shareholders are both questions of fact. *Helvering* v. *Nat. Grocery Co.*, 304 U.S. 282 (1938) ; *James M. Pierce Corporation*, 38 T.C. 643 (1962), reversed on another issue 326 F. 2d 67 (C.A. 8, 1964). In determining whether petitioner's accumulations of earnings and profits during the years in issue were for the reasonable needs of its business, it becomes necessary to determine whether prior accumulations were, in fact, sufficient to meet petitioner's needs during the current years. Sec. 1.535–3(b)(1)(ii), Income Tax Regs. However, in making the comparison of prior accumulations and current retained earnings and profits with the reasonable needs of the business, it becomes necessary to determine the nature of the surplus. The mere size of the previously accumulated earnings and profits is not in and of itself indicative that they were sufficient to cover the future needs of the business. As was stated by the Court of Appeals for the Fourth Circuit in *Smoot Sand & Gravel Corporation* v. *Commissioner*, 274 F. 2d 495, 500–501 (1960), affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 976 (1960) :

the size of the accumulated earnings and profits or surplus is not the crucial factor ; rather, it is the reasonableness and nature of the surplus. Part of the surplus may be justifiably earmarked in the form of reserves, for specific, necessary business needs.[3] Again to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to it business, the corporation may accumulate surplus with impunity. * * * [Footnote omitted.]

It therefore follows that the utilization of working capital by a business for the purchase of fixed assets, although not an occasion for a charge against earned surplus in an accounting sense, does in fact decrease the amount of funds available for operating purposes. On the other hand, if the accumulation of surplus is reflected in liquid assets which are sufficient to meet the business needs for plant expansion, working capital, and other reasonable contingencies, this is a strong indication that the accumulations of surplus were beyond the reasonable needs of the business. *Smoot Sand & Gravel Corporation* v. *Commissioner, supra* at 501.

We therefore approach the examination of petitioner's prior accumulated surplus (Dec. 31, 1956) as well as its current retained earnings and profits with the foregoing principles in mind. In determining the reasonableness of petitioner's retained earnings during the years in issue, we must keep in mind also that the burden of proof with regard to the various grounds set forth in petitioner's statement (except as to the second ground) is on respondent. Petitioner's statement can be broken into two parts. The first part contains four

grounds to show that the accumulations of earnings and profits were for the reasonable needs of the business. The second part contains three grounds showing why the accumulations were not beyond the reasonable needs of its business.

We have stated before that what the reasonable needs of a business are is, at first instance, a question for the officers and directors of the corporation. *Crawford County Printing & Publishing Co.*, 17 T.C. 1404, 1414 (1952). A corporation can finance its growth by various means. One such method is the retention of its earnings and profits until such time as it is ready to expand. *Crawford County Printing & Publishing Co.*, *supra*. Courts should be hesitant to substitute their judgment and attribute a tax-avoidance motive unless the facts and circumstances clearly warrant the conclusion that the accumulation of earnings and profits was unreasonable and for the proscribed purpose. *Breitfeller Sales, Inc.*, 28 T.C. 1164, 1168 (1957).

Petitioner maintains, and we agree, that its officers and directors, after considering the needs of the business for expansion, meeting competition and reserves for contingent liabilities, and working capital, decided to distribute a portion of its current earnings while retaining the rest. This decision by the directors of petitioner, in our opinion, reflects appropriate exercise of the managerial function when measured by the standards of a prudent businessman. *J. L. Goodman Furniture Co.*, 11 T.C. 530, 536 (1948).

We have set forth the facts in this case with great detail. An examination of those facts reveals that petitioner has not remained static, but, on the contrary, has grown from a newspaper with a circulation of 5,042 in 1940 to a circulation of 23,804 in 1960. Its total revenues have grown from $140,994 in 1940 to $1,369,725.72 in 1959, while its net income has increased from $28,234.30 in 1945 to $304,759.30 in 1959. Petitioner has not allowed its earnings to lie idle but, instead, has plowed back its earnings for the expansion of its business as well as for the acquiring of larger facilities. From 1950 through and including 1959, petitioner has invested $570,674.89 in additions to its property account, of which $232,432.62 was invested during the years in issue. The fact that this petitioner has financed its growth from retained earnings rather than from the sale of additional stock or commercial borrowing should not place it in a position of being subjected to a penalty tax under section 531. This record is replete with evidence indicating that petitioner's policy of continued growth and expansion has been followed without giving any thought whatsoever to the tax consideration of its shareholders. *Crawford County Printing & Publishing Co.*, *supra*. In 1962, a year subsequent to the years in issue, petitioner, continuing its policy of expansion, spent approximately $170,000 for the purchase of building addition, typesetting machines,

and additions to its printing presses. Included within this amount is the sum of $40,000 representing the purchase of the premises petitioner had rented since 1940. Evidence of what petitioner did in later years does affect the weight to be given to the evidence of petitioner's intentions during the years in issue. *Dixie, Inc.*, 31 T.C. 415, 430 (1958), affd. 277 F. 2d 526 (C.A. 2, 1960), certiorari denied 364 U.S. 827 (1960); sec. 1.537–1(b) (2), Income Tax Regs.

We realize that petitioner's directors act in a rather informal manner and that their plans for expansion might not be as specific as desired nor are all their plans reduced to writing and contained in formal minutes. However, the history of petitioner has been to act in an informal manner. The executive committee, which is the core of petitioner's management, meets daily and when necessary can act with deliberate speed. A closely held corporation cannot be held to the same strict formalities of large public corporations. *Times Publishing Co.* v. *United States*, an unreported case (W.D. Pa. 1963, 11 A.F.T.R. 2d 1228, 63–1, U.S.T.C. par. 9325); *Duke Laboratories, Inc.* v. *United States*, 222 F. Supp. 400, 412 (D. Conn. 1963), affd. 337 F. 2d 280 (C.A. 2, 1964). We have found as a fact that petitioner did not have any formal plans for expansion after 1958. However, by this finding we do mean that petitioner would not be justified in retaining part of its earnings for future expansion. Nor do we mean by this finding that petitioner did not have any plans for expansion subsequent to 1958. As stated earlier, petitioner's entire history reflects a policy of constant growth. It is not always possible for a company in advance to set aside a specific sum to achieve a specific goal. We are of the opinion that petitioner was justified upon the facts of this case and in keeping with its policy of constant and continuous expansion in retaining some of its earnings during the years in issue for future expansion. *Gazette Pub. Co.* v. *Self*, 103 F. Supp. 779 (E.D. Ark. 1952); *Crawford County Printing & Publishing Co.*, *supra*; *F. E. Watkins Motor Co.*, 31 T.C. 288 (1958).

Although petitioner published the only daily newspaper in Ventura City, it was not the only daily paper published within the county. It is important to petitioner to keep its circulation up throughout the county as its advertisers want to reach as large a public as possible. Petitioner did have competition from at least two other papers publishing within Ventura County. During 1959, the last year here in issue, petitioner began discussing plans for the acquiring of a newspaper in Thousand Oaks, another city in Ventura County. Formal plans were not adopted until 1960; however, the evidence of record is clear that petitioner during 1959 was aware of the situation and decided to retain some of its earnings to meet this competition. In 1961 petitioner did, in fact, pursuant to its plan, purchase a paper in

Thousand Oaks at an initial cost of $35,000. However, this was only a small portion of what was yet to come. Petitioner had anticipated that its cost in establishing the Thousand Oaks paper would run in the neighborhood of $500,000. A new plant addition for this newly acquired paper cost $455,000. Respondent recognizes that setting aside a portion of earnings to meet competition is a reasonable need of a business, but nevertheless argues that petitioner's plans during the years in issue were vague and indefinite. We disagree. Two of petitioner's directors testified that the question of how to properly meet the threat of competition was always a concern of petitioner and that throughout the years in issue petitioner was aware of the need of funds to properly protect itself in other parts of the county. What we said in *L. R. Teeple Co.*, 47 B.T.A. 270, 279 (1942), is equally pertinent here:

While it is true that petitioner has continuously and profitably operated * * * and there is no indication that it intends voluntarily to make any change in its business, it is also true that the contingencies in question are real, they are and have been continuously present, and the exercise of sound business judgment would not permit their being ignored. * * *

We are satisfied that sound business judgment required the consideration of ways to meet competition, that petitioner did have competition, and that the retention of part of petitioner's earnings for this purpose was not unreasonable. *James M. Pierce Corporation, supra* at 654. Although the facts contained in petitioner's statement regarding this ground were not sufficient to place the burden of proof on respondent, the affirmative evidence of record does convince us that petitioner has met its burden as to this ground.

Continuing with petitioner's statement, it is asserted that earnings were retained to meet the increasing contingent liability petitioner had under its profit-sharing and retirement plans. The details of said plans are set forth in our Findings of Fact. Suffice to say here that respondent's contention that because the liability was too remote and not capable of being calculated it could not justify the accumulation of surplus, is rejected. The retirement portion of the plan provided for the covered employees to receive, upon their retirement, a certain percentage of the increased value of petitioner's assets (fixed assets and goodwill) from their value as of 1950 to the date of retirement. We have set forth in our Findings of Fact the financial growth of petitioner. Not only have its annual earnings grown but its total assets have greatly increased. It is true, as respondent states, that if the future of petitioner turns sour, its liability under the retirement plans may be diminished. However, in light of the history of petitioner we are in complete agreement with the directors' action of setting up a reserve to meet this contingent liability. Sound business

judgment requires such action. The original reserve was $200,000 set up in 1956. However, in 1959, after examining the financial prospects of petitioner, it was decided by the directors that a reserve of $350,000 was more reasonable.

We agree that "a contingency is a reasonable need for which a business may provide, if the likelihood, not merely the remote possibility, of its occurrence reasonably appears to a prudent business firm." *Smoot Sand & Gravel Corp.* v. *Commissioner*, 241 F. 2d 197, 206 (C.A. 4, 1957), reversing and remanding a Memorandum Opinion of this Court, certiorari denied 354 U.S. 922 (1957). The liability under the facts in this case was contingent only as to the amount, not as to the actual liability. No management group would ignore the existence of such a liability, and the setting aside of a reserve out of accumulated surplus for such purpose was entirely proper. The growth of petitioner over the years clearly indicates the presence of goodwill, one of the measuring rods in determining the value of petitioner for purposes of the retirement plan. The goodwill, plus the increased investment in fixed assets, in our opinion, clearly justifies the reserve in the amount set aside. See *Lion Clothing Co.*, 8 T.C. 1181, 1189 (1947); *William C. Atwater & Co.*, 10 T.C. 218, 251 (1948).

Petitioner's last ground for the accumulation of its surplus was to provide funds for working capital. The retention of earnings to provide for working capital requirements has been held to be for the reasonable needs of a business. Sec. 1.537–2(b)(4), Income Tax Regs.; *J. L. Goodman Furniture Co., supra.* As an aid in determining whether a corporation's working capital requirements are sufficient to meet its needs, resort has been had to certain general rules of thumb. It has been held that a ratio of current assets to current liabilities which is in the neighborhood of $2\frac{1}{2}$ to 1 is an indication of a reasonable accumulation of surplus. Cf. *R. C. Tway Coal Sales Co.* v. *United States*, 3 F. Supp. 668 (W.D. Ky. 1933), affd. 75 F. 2d 336 (C.A. 6, 1935); *Sandy Estate Co.*, 43 T.C. 361 (1964); *Sterling Distributors, Inc.* v. *United States*, 313 F. 2d 803 (C.A. 5, 1963); *Breitfeller Sales, Inc., supra; James M. Pierce Corporation, supra.* The other rule of thumb sometimes resorted to states that an accumulation of earnings to meet operating expenses for at least 1 year is reasonable. *F. E. Watkins Motor Co., supra; J. L. Goodman Furniture Co., supra; James M. Pierce Corporation, supra.* However, it has been said that working capital requirements of one business are not necessarily the same as another business and that therefore the rule of thumb should not be given any greater weight than a rule of administrative convenience. *Dixie, Inc.* v. *Commissioner*, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958), certiorari denied 364 U.S. 827 (1960); *Barrow Manufacturing Co.* v. *Commissioner*, 294 F. 2d 79 (C.A. 5, 1961),

affirming a Memorandum Opinion of this Court, certiorari denied 369 U.S. 817 (1962). With the above general principles in mind, we will analyze petitioner's working capital requirements for the years in issue.

We have set forth in our Findings of Fact petitioner's balance sheets for the years in issue, as well as its operating expenses (excluding depreciation) and its accumulated surplus. Respondent argues that petitioner's investments in preferred stock of E. W. Scripps Co. should be considered a current asset. While we agree that the preferred stock was readily convertible into cash, we do not agree that it should be considered a current asset in this case. Petitioner purchased the stock in order to provide a return equal to the return it was required to pay the employees covered by its profit-sharing plan. At the same time, petitioner intended to partially "fund" its fixed liability under the profit-sharing plan. An asset used to fund a fixed liability can no longer be considered as a current asset.[9] For this reason we have not classified the investment in the preferred stock as a current asset. An analysis of petitioner's balance sheets reveals that the ratio of current assets to current liabilities for the years in issue, as set forth in our findings, averaged 2.63 to 1. This is some indication that the accumulation of petitioner's surplus was not unreasonable. *Sandy Estate Co., supra; Sterling Distributors, Inc.* v. *United States, supra; Breitfeller Sales, Inc., supra; James M. Pierce Corporation, supra.*

Petitioner's operating expenses during the years in issue ranged from $882,316.60 in 1957 to $1,049,341.77 in 1959. If we were to apply the rule of thumb in this case, clearly petitioner's accumulated surplus would not be unreasonable. Respondent contends, however, that resort to the rule of thumb in this case is unwarranted because petitioner's accounts receivable turned over approximately 10 times a year. Nevertheless, we believe that the rule of thumb does carry some weight in this case where the surplus is less than two-thirds of the annual operating costs. *Sterling Distributors, Inc.* v. *United States, supra* at 808; *James M. Pierce Corporation, supra.*

The second part of petitioner's statement lists three grounds which are claimed to give additional support to the position that the accumulations of earnings and profits during the years in issue were not unreasonable. They are, stated briefly, (1) a history of substantial dividend payments, (2) no loans to stockholders, and (3) no investments in unrelated businesses.

While these factors are strong indications that the accumulations were not for the proscribed purpose, sec. 1.533–1(a)(2), Income Tax Regs., they are also of some aid in determining whether or not the

---

[9] Respondent is in agreement with this rule for he states in his reply brief at pp. 12 and 12a: "The respondent agrees that where a noncurrent liability is funded that the assets used to fund the liability do not constitute current assets."

accumulations were for the reasonable needs of the business. There is no doubt that a good history of dividends, the absence of loans to the controlling stockholders, the absence of investments in unrelated businesses, and the paying of large salaries to the controlling stockholders indicate that the accumulations of earnings and profits were for legitimate business needs. *James M. Pierce Corporation, supra; Gazette Pub. Co.* v. *Self, supra.*

A close examination and comparison of petitioner's contentions with regard to these grounds with the evidence of record reveal that they are readily present here. Petitioner has a history of dividends being paid starting in 1943 and continuing up to and including the years in issue. The record reveals that the amount of petitioner's dividends, expressed in terms of a percentage of net earnings after Federal taxes, was as high as 107 percent but never below 25 percent. Respondent points to the fact that although petitioner's earnings have increased over the years, its dividends since 1950 have remained constant at $38,400 per year. While this may be true, petitioner itself has not remained constant but has used its increased earnings to expand its operations. It was through the retention of these very earnings that petitioner was able to expand and thereby consistently increase its annual earnings. Petitioner, in our opinion, acted like a prudent businessman in that it distributed a substantial part of its earnings as a dividend and elected to retain the remainder. *James M. Pierce Corporation, supra.*

Petitioner did not make any loans to Scripps. On the contrary, Scripps on different occasions loaned the petitioner money. This is in petitioner's favor. Cf. *Dill Manufacturing Co.*, 39 B.T.A. 1023, 1033 (1939). Furthermore, petitioner did not have any investments in unrelated businesses. The purchase of E. W. Scripps Co. stock, which was readily convertible into cash, was not an investment in an unrelated business but the investing of money retained under its profit-sharing plan which was intended as a partial "funding" of its liability thereunder. In addition, the purchasing and carrying of U.S. Government bonds by petitioner which are readily convertible into cash do not represent an investment in an unrelated business. *Crawford County Printing & Publishing Co., supra* at 1414; *Sandy Estate Co., supra* at 378.

Respondent argues that the loan by petitioner to Telegram Tribune Co. and Tulare Newspapers, Inc., two corporations controlled by Scripps, indicates that petitioner had excess cash which could have been distributed instead, as a dividend. While the business of these two corporations cannot be said to be the business of petitioner, they are all in the same field (newspapers). The loans made by petitioner are for relatively short terms only and are never used for long-term financing. The loans carry 6-percent interest. Under the facts and

circumstances of this case, we are not convinced that these loans require a holding that the accumulations during the years in issue were beyond the reasonable needs of the business.[10]

We have already held that petitioner's statement was sufficient to place the burden of proof as to the reasonableness of the accumulations during the years in issue on respondent with respect to the grounds stated therein (except as to the second ground). Based upon the evidence as a whole, we are not convinced that petitioner's accumulations during the years at issue were unreasonable. Although respondent has been able to show that as to at least one of petitioner's grounds, plant expansion, there were no definite plans in existence subsequent to 1958, we are not persuaded that the total accumulations are unreasonable. We are satisfied that petitioner's directors, acting for the best interest of petitioner, decided after full discussion that the retention of a certain part of each year's earnings was necessary to meet competition, meet contingent liabilities, and for working capital. The remainder of the earnings was available and was actually paid out as dividends. Accordingly, we hold that all of the retained earnings during the years in issue were for the reasonable needs of petitioner's business.

In view of the credit provided for in section 535(c)(1), it is unnecessary for us to consider whether or not petitioner was availed of for the proscribed purpose. We realize that the burden of proof as to this issue remains with petitioner. *Sandy Estate Co., supra.* However, even if petitioner were availed of for the proscribed purpose, it would still be entitled to a credit equal to the amount of earnings and profits for the taxable years which has been retained for the reasonable needs of the business. In this case the credit would be equal to the full amount of the retained earnings. Therefore, under section 535(a) the accumulated taxable income, on which the section 531 tax is imposed, would be zero.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

[10] We are also mindful of the fact that if petitioner paid out all its earnings during the years in issue as dividends, Scripps would have had a heavier personal Federal tax burden. However, we are convinced and have found as a fact that this element did not enter into the decision of the directors regarding the retention of earnings.