Cadillac Textiles Incorporated v. Commissioner.
Cadillac Textiles, Inc. v. Commissioner
Docket No. 523-72.
United States Tax Court
T.C. Memo 1975-46; 1975 Tax Ct. Memo LEXIS 326; 34 T.C.M. (CCH) 295; T.C.M. (RIA) 750046; March 4, 1975, Filed QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: Respondent determined a deficiency in the corporate income tax *329 of petitioner for the fiscal year ending April 30, 1968, in the amount of $ 297,552.04. The following questions are presented to the Court for our determination: (1) Whether respondent properly allocated income in the amount of $ 193,045.37 pursuant to his authority under section 482[1] from a related partnership,harmony Mills, to petitioner for its fiscal year ending April 30, 1968. (2) Whether petitioner is liable for the surtax pursuant to section 531 for the fiscal year ending April 30, 1968, as having been availed of for the purpose of avoiding income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided and distributed. (3) Whether the sum of $ 23,000 out of a total compensation of $ 28,000 paid by petitioner to Bernard and Philip Schwartz during the year in question should be disallowed under section 162 as being excessive. (4) Whether the depreciation deduction claimed by petitioner under section 167 during the year in question on account of certain automobiles owned by it should be disallowed *330 on the grounds that such automobiles were being used for personal, not business, purposes. (5) Whether certain entertainment expenses paid to the Preakness Hills Country Club by petitioner during the year in question are properly allowable as business expense deductions under section 162 and section 274. Findings of Fact Some of the facts have been stipulated. Such facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner, Cadillac Textiles Incorporated (hereinafter sometimes referred to as "Cadillac"), is a Rhode Island corporation having its principal place of business in New York, New York. It filed its U.S. corporation income tax return for the fiscal year ending April 30, 1968, with the district director of internal revenue, Manhattan District, New York. From its inception in 1921, Cadillac has been engaged in the business of weaving fibers into fabrics. Cadillac is an "integrated weaver," meaning that the company does its own throwing, twisting, warping, slashing and preparatory work and sells its finished goods. The company is considered to be the finest weaver in the synthetic industry and, as such, can command a price of one-half *331 to one cent per yard more for its goods than is charged by its competitors. Its principal weaving mill is located in Cumberland, Rhode Island, which, during the year in question, contained 816 looms operated by some 275 employees. In 1964, the company contemplated establishing a mill in South Carolina but subsequently decided against it due to lack of funds. Cadillac also maintains executive offices in New York City with a staff of ten employees. Samuel and Harry Schwartz are brothers and original founders of Cadillac. The former has been Cadillac's president since 1944. As its chief executive officer, he has been primarily responsible for the sales operations of the company and works mainly out of the New York office. He utilizes the services of numerous fabric brokers to procure customers for the sale of the company's fabric. Harry, on the other hand, was the company's "inside man" with responsibility for the operation of the company's mill in Rhode Island. Until his retirement in 1969, he served as treasurer of the company. During the fiscal year ended April 30, 1968, the issued and outstanding shares of capital stock of Cadillac consisted of 1,254 shares of class A voting stock *332 and 2,516 shares of class B non-voting stock. Except for the difference in voting rights, both classes of stock had identical rights and privileges. Samuel and Harry Schwartz and their respective families each owned 246 shares, or 20 percent, of the class A stock and 984 shares, or 39 percent, of the class B stock. The members of Samuel Schwartz's family holding stock in Cadillac included his two sons, Bernard and Philip, the latter's spouse, Cipora, and six grandchildren. The members of Harry Schwartz's family holding stock in Cadillac included his two sons, Joseph and Eugene, and their respective spouses, his daughter, Marion, and seven grandchildren. Some of the stock of the minor grandchildren was held in trust for their benefit. The remaining shares of the company's class A and class B stock were held by Cadillac Securities Incorporated, a family corporation in which each family held 50 percent of the issued and outstanding stock. The holders of petitioner's issued and outstanding shares of stock and the number of shares held as of April 30, 1968 are listed below: Number of Shares Held
Class A
Class B Non-
Voting Stock
Voting Stock
Samuel Schwartz and Family: Samuel Schwartz
10
Bernard Schwartz
70
333
Philip Schwartz
53
250
Cipora Schwartz
27
148
Grandchildren
(in trust and otherwise)
86
253
246
984
Harry Schwartz and Family: Harry Schwartz
8
8
Joseph Schwartz
79 1/3
149 1/3
Eugene Schwartz
79 1/3
191 1/3
Marion Silverman
79 1/3
157 1/3
Grandchildren
(in trust and otherwise)
478
246
984
Cadillac Securities
762
548
Incorporated
Totals:
1,254
2,516
*333 For its fiscal years ending April 30, 1966, 1967 and 1968, the results of Cadillac's operatons were as follows: 1966
1967
1968
Net Sales
$ 13,005,258.47
$ 10,946,807.64
$ 10,472,066.64
Less: Cost of Goods Sold
11,216,614.03
9,777,013.71
9,234,346.34 [2]
Gross profit
1,788,644.44
1,169,793.93
1,237,720.30
Less: Overhead expenses
Compensation of officers
184,400.00
205,200.00
210,200.00
Salaries and wages
84,997.50
87,862.19
89,758.09
Rents
22,600.00
26,100.00
26,100.00
Taxes
151,617.43
140,495.37
153,749.32
Depreciation
158,204.03
151,046.71
145,677.41
Other expenses
359,724.68
267,608.49
284,466.68
Total expenses
961,543.64
878,312.76
909,951.50
Operating profit
827,100.80
291,481.17
327,768.80
Other income
34,701.07
125,225.89
279,596.94 [3]
Net profit
$ 861,801.87
$ 416,707.06
$ 607,365.74
*334 The assets and liabilities of Cadillac per books as of April 30, 1966 to 1969, inclusive, were as follows: ASSETS
April 30, 1966
April 30, 1967
April 30, 1968
April 30, 1969
Cash
$ 926,860.04
$ 416,601.04
$ 572,216.88
$ 189,859.34
Notes and
1,948,859.00
2,098,896.53
3,041,833.69
1,818,690.32
accounts
receivable
Inventories
2,526,294.44
2,367,776.58
1,792,302.62
1,418,044.83
Other current
1,364.57
368.74
assets
Other investments
375,645.27
365,302.27
Building and
3,090,872.22
2,068,542.08
2,092,834.85
2,075,458.36
other fixed
assets
Less: accumulated
amortization
and depreciation
1,735,352.74
809,873.30
893,490.68
999,813.43
Land
3,850.00
3,850.00
3,850.00
3,850.00
Other assets
80,988.46
109,039.27
83,537.08
85,312.03
Total Assets
$ 6,842,371.42
$ 6,254,832.20
$ 7,070,094.28
$ 4,957,072.46
LIABILITIES AND
CAPITAL
Accounts payable
$ 695,692.84
$ 395,467.19
$ 695,187.60
$ 526,098.06
Mortgage, notes
and bonds
payable in less
600,000.00
than one year
Other current
745,571.12
308,984.81
567,781.52
455,328.07
liabilities
Common capital
75,400.00
75,400.00
75,400.00
37,700.00
stock
Earned surplus
and undivided
profits
5,325,707.46
5,474,980.20
5,731,725.16
3,337,946.33
Total Liabilities
$ 6,842,371.42
$ 6,254,832.20
$ 7,070,094.28
$ 4,957,072.46
and Capital
*335 Petitioner declared and paid dividends to its shareholders in each of its fiscal years ending 1965 through 1968 in the amounts of $ 75,400, $ 94,250, $ 49,010, and $ 67,860, respectively. These distributions represented a payment of between 20 and 25 percent of petitioner's net after-tax earnings during such years. There is no evidence in the record of any dividends being paid prior to the company's fiscal year ended 1965. The customary billing and collection period on petitioner's sales was 65 days. Instead of making an effort to collect on its accounts receivable as they matured, petitioner often preferred for business reasons to place the accounts with factors and receive interest thereon. The accounts receivable on its balance sheets as reflected above represent both current and matured accounts. During the period in question, Cadillac employed Harry Schwartz's two sons, Joseph and Eugene, on a full-time basis in the management of the company's Rhode Island mill. In addition to their duties for Cadillac, Joseph and Eugene Schwartz were also managing partners of Harmony Mills, (hereinafter sometimes referred to as "Harmony") a family partnership formed in 1957 with an initial *336 capital investment of $ 180,000 to perform "commission" weaving for Cadillac. Harmony Mills was located in Pawtucket, Rhode Island, in leased premises, 4 miles from the Cadillac mill. Harmony operated 240 looms and employed approximately 50 employees during the period in question. As of April 30, 1968, all the partnership interests in Harmony were divided among and held exclusively by the children and grandchildren of Harry and Samuel Schwartz. The partnership interests of the grandchildren were held in trust and constituted 71 1/6th percent of the total. Harmony filed partnership income tax returns for the taxable years 1967 and 1968 with the district director of internal revenue, Providence, Rhode Island. Harmony was formed in 1957 for the purpose of weaving additional yarn for petitioner because Samuel was interested in increasing production while Harry did not want petitioner to make the capital expenditures necessary to acquire additional looms. Petitioner had also found independent commission weavers to be unsatisfactory prior to the formation of Harmony. The quality of their workmanship was often shoddy and not up to the high standards for which petitioner was known. Both *337 concerns were resolved by the formation of Harmony under the management of Joseph and Eugene Schwartz. [4] The latter was the primary service partner, spending 20 percent of his time at Harmony and the balance at the nearby Cadillac mill. He received an annual salary of $ 6,500 for overseeing the general operations at Harmony and would report regularly to his brother, Joseph. Joseph Schwartz received a salary of $ 3,120 per annum. Harmony Mills had no sales department but employed a bookkeeper for taking care of the payroll and paying bills. The partnership maintained its own set of books and its own bank account. From its inception, Harmony Mills acted as petitioner's exclusive commission weaver. Petitioner would send yarn to Harmony to be woven in accordance with its instructions. The finished fabric would then be sent back to Cadillac. [5] Harmony did the quilling, while Cadillac performed the warping, slashing, and twisting of yarn. Under this arrangement, Harmony never had to make material purchases or carry inventories. *338 Harmony Mills received as compensation from Cadillac for the services performed, a commission based on the volume of yards woven for petitioner. The commission rates which Harmony charged petitioner were established on the basis of negotiations between Eugene Schwartz, representing Harmony, and Samuel Schwartz, acting on behalf of Cadillac. Depending on the market conditions, the negotiations were held on an annual or semiannual basis. Due to the long runs of standard fabric styles, little negotiating was necessary. The styles of fabric woven by Harmony Mills during the 12 months ended April 30, 1968, the yards of each style woven, the construction of each style and the commission rate it charged Cadillac during this period, in addition the approximate range of commission rates Cadillac would have been charged on the open market for these fabrics, are set forth below: Commission
Commission
Rate
Rate
Style
Yards
Per Yard
Per Yard
Charged
Charged [7]
Number
Description
Construction
Woven
by Harmony
on Open
Market
2967
Acetate taffeta
180 x 52 -
130,721
$ .0775
$ .0750
46inch
-.0850
W75/F150
101,187
.0800
2974
Acetate sandcrepe
172 x 64 - 46
1,707,517
.0950
$ .0900
3/4inch
-.1000
W75/F150
235,345
.0975
2977
Dacron ninon [6]
68 x 68 - 47
1,725,439
.1000
$ .0988
1/2inch
-.1138
W70/F70
891,896
.1025
Twisted 14
filament
3038
Acetate satin
222 x 76 - 45
253,036
.1125
$ .1200
3/4inch
-.1300
W75/F150
148,445
.1150
3040
Acetate satin
222 x 68 - 45
773,189
.1000
$ .1100
3/4inch
-.1200
W75/F150
56,435
.1025
2911
Dacron sheer
86 x 86 -
64,187
.1275
$ .1250
50inch
-.1400
W40/F40
144,019
.1300
Twisted 8
filament
2778
Acetate taffeta
180 x 54 -
113,508
.0800
$ .0775
46inch
-.0875
W75/F150
275,313
.0825
*339 Petitioner wove dacron ninon, acetate satin, and dacron sheer on its own looms. The only styles woven exclusively by Harmony Mills were acetate taffetas and acetate sandcrepes. The number of mills who weave exclusively on a commission basis are few. There are several reasons for this. First, they operate with a low profit margin as a result of not having the loom capacity to weave standard fabrics in large volume. Their minimal profit margins make *340 them unusually vulnerable to cyclical fluctuations in the weaving industry. For instance, when demand is slack, they not only lose the large integrated weavers as customers but the latter will become competitive by seeking out commission work rather than let its employees go and its looms remain idle. Secondly, the exclusive commission weaver often does not have either adequate quality or quantity control. With respect to the latter, these weavers have a dubious reputation for not returning the proper amount of cloth in relationship to the yarn initially given by the customer. It has been speculated that this is due less to lack of quantity control than to a desire to pad low profit margins by taking the "skimmed" yarn or finished cloth directly into the market place. Unlike the normal exclusive commission weaver, Harmony Mills was able to receive a steady and constant supply of commission work by way of petitioner regardless of the industry cycles. Its loom capacity permitted it to weave standard styles and fabrics for petitioner, and its quality and quantity control was excellent. For the taxable years 1967 and 1968, the results of Harmony Mills' operations were as follows: *341 1967
1968
Gross receipts
$ 650,877.63
$ 719,885.59
Less: Cost of goods sold
352,339.06
379,594.86 [8]
Gross profit
$ 298,538.57
$ 340,290.73
Less: Overhead expenses
Salaries and wages (other
than to partners)
$ 4,750.10
$ 5,337.51
Salaries and wages (to
partners)
9,620.00
9,620.00
Rent
20,951.90
21,176.96
Taxes
23,461.63
25,208.55
Depreciation
41,115.25
40,268.55
Miscellaneous deductions
2,710.22
2,787.55
Total expenses
102,609.10
104,399.12
Operating profit
195,929.47
235,891.61
Other income
1,698.74
856.81
Net profit
$ 197,628.21
$ 236,748.42
The assets and liabilities of Harmony Mills per books as of December 31, 1966 to 1968, inclusive, were as follows: ASSETS
1966
1967
1968
Cash
$ 22,461.60
$ 62,686.16
$ 68,064.07
Accounts receivable
53,523.88
54,540.31
59,021.52
Other current assets
516.00
683.88
691.88
Marketable securities
175,605.28
200,877.92
298,612.96
Depreciable fixed assets
Less: Accumulated depre-
ciation
177,586.92
136,471.67
96,203.12
Prepaid expenses
3,594.04
2,258.33
4,734.60
Total Assets
$ 433,287.72
$ 457,518.27
$ 527,328.15
LIABILITIES AND CAPITAL
Accounts payable
$ 5,431.56
$ 4,346.94
$ 7,361.22
Other current liabilities
16,011.60
17,790.00
20,615.78
Partners' capital accounts
411,844.56
435,381.33
499,351.15
Total Liabilities and
Capital
$ 433,287.72
$ 457,518.27
$ 527,328.15
*342 Statistical data from Robert Morris Associates for the period in question discloses the average profit and sales ratios of companies in the weaving industry having assets of $ 1 to $ 10 million dollars as follows: [9]
Robert Morris Associates $ 1M- $ 10M Assets Gross Profit as % of Sales
13.4
12.9
Net Profit as % of Sales
5.4
4.9
Cost of Sales as % of Sales
86.6
87.1
During 1966, the management of petitioner became interested in a new product on the market called "water jet looms" which, if found to be viable, would result in significant technological changes in the business of loom weaving. The conventional loom then used had shuttles to carry the filling yarn back and forth over the warn yarn. The water jet loom, on the other hand, emitted a jet of water which performed the same function as the shuttle. As a consequence, the water jet loom operated at almost twice the speed as the conventional loom and was considerably quieter in operation. At the urging of Samuel Schwartz, *343 Harry Schwartz placed a verbal order on August 13, 1967, for two Prince water jet looms at a cost of approximately $ 5,000 each with the intention of evaluating its potential usefulness to the company. Subsequently, at the direction of Harry Schwartz, the order for two water jet looms was cancelled. After the order for the water jet looms was cancelled, Samuel and Harry Schwartz met to discuss their differences. The former was of the opinion that the company would be severely hurt if it failed to keep up with the latest technological developments. The position of the latter, on the other hand, was that the loom was still in the experimental stage of development and did not merit a commitment by the company. At a meeting held in December 1967, the two brothers verbally agreed that there should be a parting of the ways. A tentative agreement was reached whereby petitioner was to purchase from Harry Schwartz and members of his family all of their shares of stock in petitioner at 90 percent of book value as of April 30, 1968. This was to permit the profits attributable to many forward contracts then in existence to be factored into the price of the stock. Harry was to leave petitioner *344 sometime prior to April 30, 1969. He in fact left the company in February of 1969. On February 26, 1969, all the stock Harry Schwartz and his family held in Cadillac Securities Incorporated was redeemed in exchange for 381 shares of class A voting stock and 274 shares of class B nonvoting stock in Cadillac. This, in addition to the shares already held, resulted in Harry Schwartz and his family owning 50 percent of both classes of stock in petitioner. Simultaneously therewith, petitioner acquired from Harry Schwartz and his family all the class A and class B stock held in the company for a total consideration of $ 2,748,830, $ 1,070,868 of which was paid the following month. Both classes of stock were redeemed on a one-for-one basis. On November 6, 1968, petitioner ordered two Prince water jet looms with spare parts at a total cost of $ 12,909.72. These looms were subsequently delivered in April of 1969. The looms were immediately installed and assembled under the supervision of Eugene Schwartz who had primary responsibility for evaluating their performance. An additional 24 Prince water jet looms were ordered in November of 1969 at $ 5,950 each and were delivered in the spring *345 of 1970. Manufacturing problems were initially encountered in operating the water jet looms including broken filaments from the failure to use proper yarn, setting and drying of cloth, cutting of reeds, and the clogging of machines with accumulations of chemicals in the water. It took petitioner well over a year to solve the drying problem alone. Eugene Schwartz completed his evaluation of the looms in the middle of 1972. Although several of the problems still remained, the looms were generally operating more efficiently and producing a better quality of fabric. In April of 1973, petitioner ordered 80 water jet looms at $ 11,000 each. That November, an additional 60 water jet looms were ordered at $ 13,000 each. These looms were in delivery at the time of the trial. Prior to his decision to leave petitioner in December of 1967, Harry Schwartz had a history of bad health, including diabetes. On December 17, 1960, he was admitted on an emergency basis to Miriam Hospital in Providence with complaints of severe pain throughout his body. He was not discharged from the hospital until January 21, 1961, at which time he was diagnosed to have suffered a myocardial infarction due to arteriosclerotic *346 thrombosis which was subsequently followed by pericarditis. In September of 1965, Harry Schwartz consulted with Irving S. Wright, M.D., in New York City. Dr. Wright concluded that he had diabetes mellitus with severe diabetic neuropathy and severe arteriosclerosis obliterans in both lcgs. At that time, he informed Dr. Wright that he was planning to semiretire in the near future. On October 12, 1966, he was admitted to the Rhode Island General Hospital complaining of chest pains. Although he had a prolonged history of diabetes, he never dieted properly and used insulin intermittently. His smoking caused claudication in his legs and his sleeping habits were poor. The diagnosis at this time was (1) arteriosclerotic heart disease with coronary insufficiency, (2) diabetes mellitus and (3) peripheral vascular disease. He was again admitted to Rhode Island General Hospital on May 26, 1967. This time he was treated for an acute gastric ulcer. He was admitted at the Joslin Clinic in Boston on October 9, 1968. He complained about his arteriosclerotic heart disease and intermittent claudication. All his leg pulses were absent and sensation to pin pricks and vibration had greatly decreased. *347 At the time of the trial in this case on March 19, 1974, he was ill and unable to testify. During the period in question, Bernard Schwartz was used by petitioner as a consultant on dyeing techniques and was paid $ 14,000 annually. Prior to 1960, he worked for Cadillac on a full-time basis. Since then, he has operated his own vacuum cleaning business in Wycoff, New Jersey. Philip Schwartz also was paid $ 14,000 annually as a consultant on fabrics for providing petitioner with current business and marketplace information on consumer trends and preferences. In addition, he acted as the middleman in sales transactions between Cadillac and Loomtex Corp., a corporation in which he was an officer, an employee, and a one-third shareholder. As a fabric converter, Loomtex would purchase merchandise from Cadillac at volumes ranging from $ 80,000 to $ 1,500,000 annually. Due to his relationship to both companies, these sales were consummated without the payment of the standard 1 percent commission fee by Cadillac. Both Bernard and Philip Schwartz devoted the bulk of their time to their own respective businesses. Neither had any fixed hours of employment with Cadillac but were available *348 on an "as needed" basis. They saw Samuel Schwartz on weekends at family gatherings. During this same period, petitioner owned several automobiles which it made available to Samuel and Harry Schwartz and to Bernard and Philip Schwartz on a full-time basis. Samuel used his company-owned automobile to commute to work between his personal residence in Paterson, New Jersey, and petitioner's corporate office in New York City. He seldom used the automobile to visit petitioner's business customers because they generally came to its New York City office. Periodically, he would use the car to travel to petitioner's mill in Rhode Island. Philip and Bernard Schwartz used their company-owned automobile to perform occasional assignments for petitioner. At all times pertinent herein, Samuel Schwartz was a member of the Preakness Hills Country Club, Wayne, New Jersey. Any expenses incurred by him at the Club were paid by petitioner. He used the Club for his own personal recreation and enjoyment, as well as for entertaining business customers. On some of the monthly bills presented to petitioner for payment, there were notations of people or business associates on account of whom he had incurred *349 specified expenses. On May 6, 1971, pursuant to section 534(b), respondent notified petitioner of his intention to assert an accumulated earnings tax with respect to the company's fiscal year ending April 30, 1968. Petitioner timely filed a sworn statement pursuant to section 534(c) setting forth the following two business reasons for its accumulation of earnings in that fiscal year: (1) It was known by the close of the fiscal year that petitioner would purchase one-half of its issued and outstanding stock, for the purpose of resolving a fundamental disagreement between Samuel and Harry Schwartz over the management of the business, and that the working capital of the corporation would be reduced thereby. The stock was purchased on February 26, 1969. (2) By the close of the fiscal year, petitioner decided that after one-half of the issued and outstanding stock was purchased it would promptly proceed to embark on a program to purchase, install, and house water jet looms at a cost expected to exceed $ 3,000,000. The program commenced on November 6, 1968 and is proceeding at the present time. Petitioner subsequently filed a motion pursuant to Rule 142(e) of the Court's new Rules *350 of Practice and Procedure requesting a ruling from the Court that its statement under section 534(c) was sufficient to shift the burden of proof to the respondent with respect to the business reasons asserted therein for its accumulations. This Court denied such motion. On October 28, 1971, respondent sent a notice of deficiency to petitioner in which he asserted an accumulated earnings surtax against the company for the fiscal year in question. At the same time, he reallocated profits from Harmony to Cadillac for the same period in the amount of $ 193,045.37 pursuant to his authority under section 482. In addition, he disallowed deductions claimed by Cadillac during this fiscal period for salaries paid Bernard and Philip Schwartz, for depreciation on the company automobiles used for personal purposes and for certain entertainment expenses paid to the Preakness Hills Country Club on account of Samuel Schwartz. Opinion In determining the taxable income of Cadillac for the fiscal year ending April 30, 1968, the respondent has included therein $ 193,045.37 of the net profit realized by Harmony Mills on account of "commission weaving" for Cadillac. As a basis for the allocation, *351 respondent relies upon section 482. That section provides as follows: SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. Due to the relationship of the parties, it is clear that Cadillac and Harmony Mills were owned or controlled directly or indirectly by the same interests within the meaning of section 482. Samuel and Harry Schwartz, brothers, and their respective families owned or controlled all of the stock of Cadillac. The children and grandchildren of Samuel *352 and Harry Schwartz comprised the partners in Harmony Mills. Harmony was formed in 1957 for the specific purpose of weaving fabrics for Cadillac. Insofar as this record shows, Harmony has done no other business. In addition to being partners in Harmony Mills, Joseph and Eugene Schwartz, the managing partners, were likewise full-time employees of Cadillac. During the fiscal year ending April 30, 1968, Harmony's billings toCadillac totaled $ 719,885.59, on account of which the partnership realized an operating profit of $ 235,891.61. For the same period, the net sales of Cadillac totaled $ 10,472,066.64, on account of which Cadillac realized an operating profit of $ 327,768.80. The apparent disparity in profits in relation to sales, as between related taxpayers, unless otherwise accounted for, would in itself warrant the respondent to make some adjustment under section 482. In determining the amount of the adjustment, the respondent proposes to allow Harmony a gross profit of 10 percent and to allocate any amount in excess thereof as additional income attributable to Cadillac. While the Court agrees that some allocation is fully warranted, in our opinion the method followed by the *353 respondent can best be described as "heavy handed." In making any comparison between the operating profit realized by Harmony and the operating profit realized by Cadillac in relation to sales or costs, consideration must also be given to differences between the elements making up both sales and costs of the respective taxpayers. See, for example, American Terrazzo Strip Co., 56 T.C. 961 (1971). For example, in the case of Cadillac, there are reflected not only sales of goods woven by Cadillac but also the sales of goods woven by Harmony. With respect to the latter, Cadillac might be expected to realize a lower profit margin than it would realize on the sales of goods woven in its own plants. In contrast, the goods woven by Harmony were produced from yarns supplied by Cadillac, and the cost of such yarns are not reflected in the sales or profits of Harmony. This produces a higher profit margin in relation to sales than would be the case if the cost of the yarn had been reflected in the costs and sales of Harmony. In contrast to Cadillac, Harmony was primarily selling direct labor with no cost of materials and minimal overhead. The petitioner renes largely on proof *354 that the prices paid to Harmony Mills for commission weaving were comparable to charges paid other commission weavers on a yardage basis. In reliance thereon, petitioner cites respondent's regulations. Section 1.482-2(b), Income Tax Regs., provides, as follows: (b) Performance of services for another - (1) General rule. Where one member of a group of controlled entities performs marketing, managerial, administrative, technical, or other services for the benefit of, or on behalf of another member of the group without charge, or at a charge which is not equal to an arm's length charge as defined in subparagraph (3) of this paragraph, the district director may make appropriate allocations to reflect an arm's length charge for such services. Insofar as material herein, subparagraph (3) of the regulations defines an arm's length charge, as follows: (3) Arm's length charge. For the purpose of this paragraph an arm's length charge for services rendered shall be the amount which was charged or would have been charged for the same or similar services in independent *355 transactions with or between unrelated parties under similar circumstances considering all relevant facts. Taking the respondent's regulation in its complete context, the position of the petitioner completely disregards the fact that comparable charges for similar services are a guide only "under similar circumstances considering all relevant facts." The petitioner did not deal with Harmony Mills in the same manner as it would have dealt with an unrelated commission weaver. The prices relied on by the petitioner are presented transactions on isolated orders placed for the convenience of the party placing the order with no commitment as to continuing future orders. In contrast, the record in this case shows that the petitioner placed continuing orders with Harmony Mills, notwithstanding a shrinkage in petitioner's sales. The relationship was one which had been in effect for many years, on a continuing basis, and there was every reason to believe that Harmony Mills would receive a share of the business. The record would not substantiate a claim that the only orders placed with Harmony Mills represented weaving that petitioner could not as well perform in its own plan. Therefore, *356 when we consider all the relevant facts, the position of Harmony Mills with respect to the petitioner is dissimilar from the independent commission weavers. Section 482 rests almost wholly upon the discretion of the respondent. No hard and fast rules are prescribed for the reallocation of income, deductions and the like, as between related taxpayers. Nevertheless, the reasonableness of the respondent's determination rests upon the facts. Ballentine Motor Co. v. Commissioner, 321 F. 2d 796, 800 (C.A. 4, 1963), affirming 39 T.C. 348 (1962); Commissioner v. Chelsea Products, 197 F. 2d 620, (C.A. 3, 1952). Where some allocation is justified, if the respondent fails to follow a reasonable method in making such allocation, the Court must substitute its judgment. American Terrazzo Strip Co., supra. In order to afford Cadillac an opportunity to present evidence with respect to Cadillac's cost of weaving goods comparable to those woven by Harmony, the Court reopened the record in this case for the purpose of enabling the parties to submit *357 financial data showing separately the sales and cost of sales of Cadillac with respect to the cloth produced by Harmony Mills and the comparable cost to Cadillac of producing such cloth in Cadillac's mills. Petitioner's counsel declined to submit such evidence. Unfortunately, this places upon the Court the burden of decision without having all of the facts. The record does permit the Court to determine with complete accuracy the labor content of the sales made by Harmony Mills to the petitioner and the labor content of the sales made by petitioner, including the resale of goods woven by Harmony Mills. This is commonly referred to as the "value added" factor. Looking to the combined profits of both enterprises, and applying this factor, it is the Court's conclusion that there should be allocated to the petitioner under section 482 for the fiscal year ended April 30, 1968, the sum of $ 100,000 on accounts of profits reflected in the charges paid to Harmony Mills for commission weaving. We so hold. In addition, the Court is called upon to decide whether Cadillac, during its fiscal year ending April 30, 1968, was availed of for the purpose of avoiding income tax with respect to its *358 shareholders within the meaning of section 532 by permitting its earnings and profits to accumulate instead of being divided or distributed. [10] If so, petitioner is subject to the surtax on accumulated earnings imposed by section 531. [11]
*359 Whether a corporation has been availed of for the proscribed purpose of section 532 is strictly a question of fact. Helvering v. Nat. Grocery Co., 304 U.S. 282 (1938); Bremerton Sun Publishing Co., 44 T.C. 566 (1965). In this regard, each case must stand on its own merits. Section 533 provides that the fact that the earnings of the corporation have been permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid income tax with respect to its shareholders. To rebut this presumption, the corporation must prove by a preponderance of the evidence that the avoidance of tax on its shareholders was not the purpose for accumulating its earnings. [12]Section 537 provides the term "reasonable needs of the business" includes "the reasonably anticipated needs of the business." *360 At the start of the fiscal year in question, petitioner had permitted its earnings and profits to accumulate beyond its normal business needs. Its earned surplus account for the fiscal year ending April 30, 1967, stood at $ 5,474,980.20. The major part of petitioner's surplus account was reflected in liquid assets and was thus available for meeting the company's current business needs. See Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495, 500-501 (C.A. 4, 1960), certiorari denied 362 U.S. 976 (1960). Its net working capital was $ 4,178,822.15, and the ratio of its current assets to current liabilities was 6.9 to 1. A current ratio in the neighborhood of 2 1/2 to 1 has been held to be a reasonable accumulation of surplus. John P. Scripps Newspapers, 44 T.C. 453 (1965). Although working capital requirements may vary among different businesses, a current ratio of 6.9 to 1 must be adjudged more than sufficient under the present circumstances. [13] The strength of petitioner's liquidity position is further reflected by the ratio of its cash, marketable securities and receivables to its current liabilities which was 3.6 to 1. [14] *361 *362 Thus, it was incumbent upon petitioner to prove that its earnings for the year in question were accumulated for other legitimate business purposes. To meet that burden, petitioner submitted a statement under section 534(c) in which it contended that the reasonable needs of its business should be enlarged to include: (1) Its purchase of one-half of its issued and outstanding stock as a means of resolving a fundamental disagreement between Samuel and Harry Schwartz over the management of the business; and (2) Its decision to embark on a new program to purchase, install, and house water jet looms at an estimated cost of $ 3,000,000. Petitioner requested the Court for a ruling that such statement was sufficient to shift the burden of proof as to the truth of these allegations to respondent under section 534(a)(2). Its motion was denied. Irrespective of the placement of the burden of proof, however, the facts clearly indicate that during the fiscal year in question petitioner accumulated its earnings and profits beyond the reasonable needs of its business. Leaving aside the redemption of stock for the moment and turning first to petitioner's contention that additional accumulations *363 of earnings were needed to fund a new water jet loom project, the facts indicate that the company did not have a "specific, definite, and feasible" plan in effect for the purchase of these looms during the year in question as required under the statute. See section 1.537-1(b), Income Tax Regs.[15]
Petitioner first began investigating *364 the water jet loom and the new technological advances it made around 1966. Two such looms were ordered in the fall of 1967 on an experimental basis but were subsequently cancelled at the insistence of Harry Schwartz. There is no evidence of any renewal of interest in the looms on the part of petitioner until November of 1968 when another order for two looms was placed. This occurred well past the fiscal year in issue. Although Samuel Schwartz testified that the acquisition program was in effect during the year in question, no written plan for the acquisition was ever presented at trial. Nor is there any indication that an application of funds statement, an earnings projection or a cash flow analysis, was ever prepared with respect to the contemplated acquisition. Petitioner directs our attention to the company's continuous record of expansion. Its balance sheets for the fiscal years 1965 through 1968, however, indicate little or no change in its net fixed assets. We recognize that a closely held corporation cannot be held to the same strict formalities as the large public corporation. See Bremerton Sun Publishing Co., supra; John P. Scripps Newspapers, supra. *365 However, there must be something more than a mental conception of a plan by petitioner's chief executive for us to conclude such a plan was actually in existence as of a given date. The fact that Samuel Schwartz may have anticipated a need for purchasing water jet looms at some future point in time is not the equivalent of petitioner having a plan of acquisition. Atlantic Properties, Inc. 62 T.C. 644 (1974), on appeal (C.A. 1, Nov. 13, 1974). Indeed, the adoption of such a plan by petitioner during the period in question was rended an impossibility in the face of Harry Schwartz's continued resistance to the proposed project. Samuel Schwartz freely admitted as much at trial. Whatever may have been the status of this project in Samuel Schwartz's own mind, we cannot attribute it to petitioner and even if we could, it was too vague and remote to justify any further accumulation of the company's earnings and profits during the fiscal year in question. Even assuming for the moment that a plan did in fact exist, petitioner still had ample earnings to meet any of its anticipated needs with respect to its water jet program. This is taking into account its normal working capital *366 requirements. As of the date of trial, almost 6 years after the period in question, petitioner had only spent or committed a total of $ 1,800,000 on the project. Moreover, petitioner was able to pay out in excess of $ 2,700,000 in 1969 to redeem the stock of Harry Schwartz and his family without affecting either its current operations or the ability to proceed with its evaluation and testing of the new looms. [16]
Thus, petitioner can justify a further accumulation of earnings during the year in question only if it can show that the redemption of the Harry Schwartz family's stock qualified as a legitimate business need as of April 30, 1968. From the record before the Court, the conclusion is inescapable that the redemption was principally motivated by personal, not business, considerations. Harry Schwartz had been in ill health for a long period of time and had contemplated retirement prior to the year in question. Although the dispute between Harry and Samuel Schwartz over *367 the viability of the water jet looms may have been a consideration in the redemption, the Court is not convinced that this was the principal consideration. Harry and Samuel Schwartz were brothers and worked together for over 40 years in the development of an eminently successful business. Samuel Schwartz testified that they remained on best of terms even after the redemption agreement was settled between them. It strains our creditability to believe that a dispute over the ordering of several water jet looms on an experimental basis brought about the "breakup" of the relationship. Rather, we would attribute it to the poor state of Harry's health. Certainly no business purpose can be ascribed to petitioner's simultaneous redemption of the stock held by Engene and Joseph Schwartz and their respective families. It was at the instance of Harry Schwartz, not petitioner, that the entire family block be redeemed. Eugene Schwartz protested vigorously to yielding his stock interest in the company, and after the redemption, he continued to work for the company and to support its policies. Furthermore, Samuel Schwartz testified that Harry Schwartz insisted on the complete redemption of his *368 and his family's stock to ensure capital gains treatment on the transaction. This is not a situation where the operation of the business would come to a standstill or the company would be threatened with liquidation if the conflict among the shareholders were permitted to continue. See Mountain State Steel Foundries, Inc. v. Commissioner, 284 F.2d 737 (C.A. 4, 1960), reversing a Memorandum Opinion of this Court. Nor was there a finding in that case, as there was here, that the earnings of the taxpayer were accumulated unreasonably or in excess of the needs of the business prior to the redemption itself.[17] Furthermore, the retirement of Harry Schwartz from the business was imminent during the year in issue and the source of conflict would automatically be resolved. Based on the record, we find that the principal reason behind the redemption was a personal desire to withdraw from the business on the part of Harry Schwartz due to his poor health. The full amount of the stock held by the remainder of his family was redeemed to achieve desired tax benefits and not to fulfill any business need *369 on the part of the company. Accordingly, the redemption fails to qualify as a legitimate business need on account of which any accumulation can be justified. Even assuming the redemption served a business purpose, it still would not qualify as a legitimate business need pursuant to section 537. During the fiscal year in question, there existed no "specific, definite, and feasible" plan concerning the redemption as required under the statute. Section 1.537-1 (b)(1), Income Tax Regs. No written evidence of any such agreement was ever introduced by the petitioner. Samuel Schwartz testified that a verbal understanding was reached in December of 1967 about the terms and conditions of the redemption. However, we do not view such testimony, without more, to be a sufficient basis on which to permit an accumulation of earnings under the statute. The actual redemption was not effected until February of 1969, over a year after the agreement was supposedly reached. Furthermore, the other party to this agreement, though ill, has not come forward to testify on this matter. We cannot take into account, as petitioner requests, the effect of the contemplated redemption *370 on its earnings since the actual redemption did not occur until the following year. Cf. GPD, Inc.60 T.C. 480 (1973), reversed and remanded (C.A. 6, Dec. 6, 1974). [18] We would only be able to account for such redemption during the year in question if it possessed a legitimate business purpose, and we have held that it did not. Based on the facts before us, we find that petitioner had accumulated its earnings beyond its legitimate business requirements for the fiscal year in question. Having failed to rebut the presumption which attaches to such excess accumulation under section 533, petitioner is subject to the surtax on its accumulated earnings as provided by section 531. [19]
*371 Turning now to the remaining issues, petitioner paid as compensation during its fiscal year ended April 30, 1968 the sum of $ 14,000 to Bernard Schwartz and the sum of $ 14,000 to Philip Schwartz, the sons of Samuel Schwartz. The respondent has disallowed $ 23,000 of the total compensation of $ 28,000. The burden rests upon the petitioner to prove what constitutes a reasonable amount of compensation to each. Miller Box, Inc. v. United States 488 F. 2d 695 (C.A. 5, 1974). The record shows that both Bernard and Philip Schwartz had other full-time occupations. Their services, if any, were available only on an "as needed" basis. It likewise appears that Philip was in a position, through his employment by Loomtex Corp., to facilitate transactions between the petitioner and Loomtex Corp. whereby petitioner effected a savings of between $ 8,000 and $ 15,000 per year. Upon a consideration of the record, it is the opinion of the Court that the petitioner might properly pay Philip as much as $ 5,000, in the absence of any conflict of interest, for acting as an intermediary between the petitioner and Loomtex Corp. However, the record is so vague as to preclude the Court from *372 placing any value on the services of Bernard. Accordingly, the determination of the respondent will be sustained. During the year in question, petitioner also supplied various members of the Schwartz family with automobiles, on account of which petitioner deducted depreciation. To the extent that any proof was offered with respect to the use of such automobiles, the Court is forced to conclude that the automobiles were used either for commuting or as the personal automobile of the individual involved. The disallowance of this item must likewise be sustained. Finally, petitioner claimed entertainment expense deductions on account of the amounts spent by Samuel Schwartz at the Preakness Hills Country Club during the year in question. There was insufficient proof to qualify such expenses as ordinary and necessary business expenses within the requirements of section 274 (a)(1)(A) and (B). Moreover, the substantiation requirements of section 274(d) have not been satisfied with respect to such expenses. See Handelman v. Commissioner F. 2d (C.A. 2, decided Jan. 27, 1975). In accordance with the above, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Cadillac's cost of goods sold for its fiscal year ending April 30, 1968, was comprised of inventory costs of $ 6,264,700.01, labor costs of $ 1,609,423.90, and other direct costs of $ 1,360,222.43. ↩
3. From Cadillac's tax return for its fiscal year 1968, it appears that $ 171,341.91 of its other income for this year is attributable to commission work income.↩
4. Aside from Joseph and Eugene Schwartz, no other employees of Cadillac worked at Harmony.↩
5. An alternative method of negotiating commission work involves selling the yarn to the mill at the outset with instructions and entering into an agreement to buy back the finished product at a set price. The spread between the beginning and end sales contracts represents the manufacturing or commission cost. The large integrated mills preferred this method since it best disguises the fact that they were doing "commission work," a designation they actively sought to avoid.↩
7. The price range charged for commission weaving during a 12-month period generally had a tolerance of 1 to 2 cents a yard as a result of the interplay between the availability of yarn and the availability of looms. Except for the dacron ninon, the price range for each style of fabric is based on orders made by an unrelated third party during the period in question that exceed, in volume, the number of yards woven by Harmony for Cadillac during this period. The price range for the dacron ninon is based on the commission rates charged by Plaza Mills Inc., an integrated weaver, on the weaving of 414,000 yards of the fabric between August through November of 1967.↩
6. "Dacron ninon" is the trade name of Dupont for polyester fiber. ↩
8. Harmony's cost of goods sold for the taxable year 1968 was comprised of labor costs of $ 297,664.46 and other direct costs of $ 81,930.40.↩
9. The statistics on which the Robert Morris Associates figures are based include broadwoven fabric mills (cotton, synthetic and silk) and integrated and commission mills.↩
10. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531↩ shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. 11. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $ 100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $ 100,000.↩
12. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532↩, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.
13. Petitioner argues that based on the so-called Bardahl formula, it should be permitted to accumulate its earnings to cover a single operating cycle, which by petitioner's calculations amounts to $ 4,999,336. See Bardahl International Corp., T.C. Memo. 1966-182, and Bardahl Manufacturing Corp., T.C. Memo. 1965-200. The Bardahl formula, however is only one of several rules of thumb this Court may employ to determine whether the accumulation of earnings by a taxpayer is reasonable. The Cheyenne Newspapers, Inc., T.C. Memo. 1973-52, aff'd 494 F. 2d 429↩ (C.A. 10, 1974). Furthermore, one of the components in the Bardahl formula, turnover in accounts receivable, cannot be accurately determined here as a result of petitioner's policy of keeping its accounts receivables on open account after the date due in order to collect interest thereon. 14. This ratio, commonly known as the "quick ratio," is considered to be a better indication of a company's current financial strength than the "current ratio" since it eliminates the inventory as a factor in determining a company's liquid assets. The exact liquid value of inventory is often a matter of speculation.↩
15. § 1.537-1. Reasonable needs of the business. * * *
(b) Reasonable anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. * * * Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.↩
16. A portion of the total purchase price was represented by a $ 600,000 short-term loan taken out by the company to help finance the redemption. The loan, however, was able to be repaid within the year.↩
17. See also Farmers & Merchants Investment Co. T.C. Memo. 1970-161↩.
18. Cf. Sec. 537 which was amended by Pub. L. 91-172 in 1969 to include within the term "reasonable needs of the business" a redemption of stock qualifying under sec. 303. Such redemption, however, can only be considered a legitimate business need for the taxable year of the corporation in which the shareholder died or for any taxable year thereafter. Sec. 537(b)(4)↩.
19. Petitioner points to its dividend history as reflecting the absence of the proscribed purpose. Although the company made dividend distributions to its shareholders of approximately 20 percent of its after-tax earnings in each of its fiscal years ending 1965 through 1968, there is no evidence in the record that any dividend distributions were ever made prior thereto. The company had been in existence since 1921 and had substantial accumulations of earnings prior to its fiscal year ended 1965.↩