BROOKFIELD WIRE COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brookfield Wire Co. v. Commissioner
Docket No. 4578-76.
United States Tax Court
T.C. Memo 1980-321; 1980 Tax Ct. Memo LEXIS 264; 40 T.C.M. (CCH) 985; T.C.M. (RIA) 80321; August 18, 1980, Filed D. Michael Kratchman and Edward Michael Deron, for the petitioner. Clyde W. Mauldin and Chauncey W. Tuttle, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies and additions for accumulated earnings taxes for petitioner: Year
Deficiency
Accumulated Earnings Tax
1972 [1]
$8,890.34
$ 49,217.53
1973
9,570.04
106,358.61
Due to concessions made by the parties, the sole issue for decision is whether petitioner was availed of for the purpose of avoiding federal income tax with respect to its sole shareholder by permitting earnings and profits to accumulate instead of being distributed. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time it filed its petition, petitioner had *266 its principal place of business in West Brookfield, Massachusetts. Petitioner was organized on September 24, 1951, as a Massachusetts corporation by John M. Richardson (hereinafter referred to as "Richardson") to engage in the business of producing stainless steel and nickel wire. Petitioner's primary production operations consist of drawing, cleaning, coating and annealing wire. These operations are conducted at a plant and office facility located in West Brookfield, Massachusetts. This facility rests on a 114 acre tract of land and consists of approximately 46,000 square feet devoted to plant and office space, and approximately 1,900 square feet for storage. Petitioner markets its products throughout the United States; its customers include manufacturers of rope cable, hose reinforcement, braid wire and weaving wire for the manufacture of wire cloth and screening. For the ten months ending December 31, 1972, petitioner had sales of $1,659,512. Sales for the calendar year ending December 31, 1973, were $2,182,814. Petitioner's business is neither seasonal nor cyclical. From 1951 through 1963, Richrardson owned all of petitioner's 600 shares of common stock and served *267 as petitioner's president. In 1963 Richardson transferred the 600 shares to Edgcomb Steel Company ("Edgcomb"), a publicly-held Pennsylvania corporation, in exchange for 77,000 shares of Edgcomb common stock. Edgcomb retained Richardson as petitioner's president. In October 1967 Reeves Industries, Inc., the parent company of petitioner's largest customer, experienced shareholder dissension which resulted in the availability of 170,000 shares of its common stock. Richardson brought this investment opportunity to the attention of Edgcomb's president who indicated that Edgcomb had no interest in it but would not oppose Richardson's personal acquisition of the block of stock. Richardson personally purchased the stock, thereby making him the largest single shareholder in Reeves Industries, Inc. The 170,000 shares represented an ownership interest of approximately 4.9%. By virtue of his stock ownership, Richardson became president and chairman of the board of Reeves Industries. Subsequently, Reeves Industries changed its name to RSC Industries, Inc. ("RSC"). In 1969 The Williams Companies ("Williams"), a Nevada corporation, acquired Edgcomb in a nontaxable merger. [2] As a consequence *268 of that merger Richardson received 72,788 shares of Williams $.80 convertible series A preferred stock in exchange for the Edgcomb shares then held by him. Richardson remained as petitioner's president following Williams' acquisition. In June 1971 Edgcomb notified Richardson that it had decided to replace him as petitioner's president because he was felt not to be devoting sufficient time to petitioner's daily operations. In response to Edgcomb's decision, Richardson offered to purchase all 600 shares of petitioner's common stock from Williams in exchange for the Williams' preferred stock then held by him. An exchange between Williams and Richardson thereupon occurred in three steps pursuant to an agreement dated September 1, 1971. First, Edgcomb distributed to Williams the 600 shares of petitioner's common stock. Second, on February 28, 1972, petitioner declared and paid a $150,000 dividend to Williams in order to equalize the value of the preferred stock to be surrendered by Richardson with the agreed upon value of petitioner. Third, on February 28, 1972, Williams transferred the 600 shares of petitioner's *269 common stock to Richardson in exchange for 52,788 shares of Williams preferred stock. [3] Richardson remained petitioner's sole shareholder during the years in issue. From 1963 to March 1, 1972, when either Edgcomb or Williams owned petitioner's stock, the following dividends were paid by petitioner: Year Paid
Amount
1966
$ 400,000
1968
450,000
1970
400,000
1972 [4]
150,000
Total
$1,400,000
Petitioner never paid a dividend during the years in which Richardson was its sole shareholder. After regaining control of petitioner, Richardson increased his salary as president from $40,000 to $70,000 annually and increased the monthly rent paid to him by petitioner for use of his personal airplane from $1,000 to $2,000. In 1972 Richardson inspected a number of facilities located in North Carolina, South Carolina and Georgia. At this time, petitioner's facilities in West Brookfield, Massachusetts were operating at full capacity, and petitioner wanted to expand. *270 The decision to investigate expansion possibilities outside of Massachusetts rather than merely expanding the existing facilities was premised on a number of factors, including Richardson's perception of the business claimate then existing in Massachusetts, that state's tax structure and the existing labor market.Richardson inspected existing facilities because he did not want to take the time required to construct a new facility. During the latter part of 1972 Richardson inspected an 84,000 square foot facility located in Allendale, South Carolina. The size of the Allendale facility exceeded petitioner's expansion requirements. [5] Despite the size of the Allendale plant, Richardson believed that it was the best expansion site available at the time. Richardson approached RSC's board of directors for the purpose of securing a tenant for the excess space. At this time Richardson knew that one of RSC's divisions, Gavitt Wire & Cable ("Gavitt"), required new facilities. [6] On January 25, 1973, the corporation owning the Allendale facility authorized its sale to petitioner.Petitioner's board of directors authorized the purchase of the property for $475,000 on February 2, 1973, and *271 on April 3, 1973, it was purchased. In February 1973 RSC's board of directors visited the Allendale facility and agreed to lease 40,000 square feet of it from petitioner. Prior to petitioner's acquisition, the Allendale plant had been used as a processing plant for cold storage foods and as a grocery warehouse distribution center. Accordingly, the plant required electrical and plumbing alterations in order to transform it into a manufacturing facility. Initially, petitioner intended to use the Allendale site as a satellite plant for the production of special wires for its existing customers. From a long-range perspective, petitioner hoped to combine the increased capacity with an increased marketing effort so as to realize an annual increase of 15% in corporate sales. Petitioner purchased $35,000 worth of wire drawing machinery and equipment from a subsidiary of RSC in May 1973 as part *272 of the plant preparation. Additionally, petitioner assembled at the Allendale plant an assortment of dies used for drawing wire. Some of these dies were shipped from petitioner's West Brookfield plant in May 1973 while the remainder were purchased from an Indiana distributor in December 1973. Petitioner acquired no other equipment or machinery for the Allendale plant; also petitioner did not acquire any inventory for the Allendale site. Gavitt occupied the leased portion of the Allendale site on or about April 5, 1973, on an oral lease which provided for an annual rent of $80,000 payable in equal monthly installments. All alterations and improvements required by Gavitt's operations were paid by RSC. The estimated cost of these improvements totaled $275,000, of which $15,000 had been expended by June 30, 1973. In addition, RSC expected to spend approximately $500,000 on equipment in order to make the leased premises fully operational. RSC anticipated that Gavitt would be fully operational by the summer of 1974. On or about August 2, 1973, petitioner commenced negotiations with Howmet Corporation ("Howmet"), a Delaware corporation, regarding the acquisition of the assets of *273 Howment's wire manufacturing and sales facility located in Northhampton, Massachusetts. Besides competing with petitioner in the sale of a number of products, Howmet also produced certain items which were not manufactured by petitioner. At the time petitioner possessed only $600,000 of the proposed $1,800,000 purchase price. Petitioner intended to borrow the remaining $1,200,000 from its bank, Worchester County National Bank. The parties advanced to the stage of refining a second draft of the proposed purchase agreement before petitioner called off the deal on or about September 4, 1973, due to contemporaneous negotiations between petitioner and Handy & Harman, a New York corporation, regarding the acquisition of petitioner by Handy & Harman. In August 1973 [7] Handy & Harman offered to purchase all of petitioner's stock from Richardson for a total cash purchase price of $3,050,000. [8] Handy & Harman investigated Howmet's operations and concluded that it was not interested in acquiring Howmet either directly or through petitioner. Accordingly, Handy & Harman requested petitioner to terminate its negotiations with Howmet. *274 On or about September 28, 1973, Richardson executed a stock purchase agreement with Handy Wire, Inc., a wholly-owned subsidiary of Handy & Harman, which provided for a total cash purchase price of $3,050,000 in exchange for all of petitioner's common stock. The obligation to purchase petitioner was conditional on the merger between RSC and Handy & Harman.Furthermore, the agreement contained the following provisions: 1.12. Except as set forth in Exhibit B [petitioner] has not, since [August 31, 1973]: * * *
(h) Authorized any capital expenditures for additions to plant account in excess of $25,000 in the aggregate. (i) Made any declaration, setting aside or payment to its shareholder of any dividend or other distribution in respect of its capital stock, or redeemed or purchased any of its capital stock, or agreed to take any such action. As a result of these provisions, petitioner suspended its expansion activities. At the time the stock purchase agreement between Richardson and Handy & Harman was executed, negotiations were in progress between petitioner and RSC relating to the long-term lease or purchase by RSC of the entire Allendale facility. Because of *275 the proposed transactions involving Handy & Harman, petitioner and RSC executed a written lease agreement on October 30, 1973, with respect to the 40,000 square feet of the Allendale plant then being used by RSC's division. [9] The lease provided for a monthly rent of $6,666.67 for a term which was deemed to have commenced as of April 5, 1973, and was to terminate on June 30, 1974. The lease also contained two options. The first permitted RSC to purchase the entire Allendale property and the second allowed petitioner to require RSC to purchase the entire Allendale property. The exercise price under either option equaled petitioner's basis in the property for tax purposes. The two options served distinct purposes. The first option protected RSC's investment in renovating and adapting the Allendale facilities to Gavitt's needs.The second option protected petitioner against the withdrawal of the Gavitt opeerations from the Alendale site thereby leaving petitioner with substantial excess space and possibly no suitable replacement tenant. [10]
*276 On December 3, 1973, RSC's board of directors terminated the proposed merger with Handy & Harman because of the decline in value of the latter's stock. The failure of the RSC-Handy & Harman merger to materialize caused the cancellation of Handy & Harman's acquisition of petitioner. Petitioner's audited financial statements for the year ended December 31, 1973, listed the entire value of the Allendale property as rental property on the balance sheet and in the accompanying notes to the financial statements. [11]
On January 2, 1974, an officer of Hoskins Manufacturing Company ("Hoskins"), a Michigan corporation, contacted Richardson concerning Hoskins' interest in acquiring petitioner. Hoskins inspected petitioner's facilities except for the Allendale plant.Hoskins saw no need to inspect the Allendale property after being advised by Richardson that RSC intended to exercise its option to purchase the property. The parties executed an agreement on April 5, 1974, providing *277 for the purchase of 400 shares of petitioner's stock by Hoskins' wholly-owned subsidiary for $2,050,000. As part of the stock purchase agreement Richardson agreed to have the remaining 200 shares of petitioner's stock redeemed from him by petitioner for $1,000,000 in cash and property. [12] The stock purchase and the stock redemption occurred simultaneously on April 22, 1974. On March 4, 1974, RSC notified petitioner of its decision to exercise its option to purchase the entire Allendale property. Petitioner's board of directors unanimously authorized the sale of the property to RSC on March 22, 1974, for $469,656 (petitioner's basis in the property for tax purposes). Subsequently, Hoskins removed a portion of petitioner's equipment from the Allendale plant and placed that equipment in petitioner's West Brookfield plant and in other plants owned by Hoskins. Hoskins sold the remainder of the equipment to RSC. Richardson, as petitioner's sole shareholder and president, directed petitioner's activities on an informal basis during the years in issue. Accordingly, there are no extensive corporate *278 minutes or resolutions for this period. Those corporate minutes which do exist do not contain any references to petitioner's expansion plans. Richardson regularly borrowed money from petitioner. During the two years in issue, petitioner's books showed a loans receivable balance of principal and accrued interest from Richardson of $22,356.83 at December 31, 1972, and $55,496.55 at December 31, 1973. Richardson's marginal tax rate brackets for 1972 and 1973 were 55% and 50%, respectively. Prior to the trial of this case, the parties agreed to dispose of respondent's income tax adjustments. Among the items agreed to was the disallowance of travel and entertainment expenses of $4,170.80 for 1972 and $5,004.96 for 1973. Richardson consented to an adjustment on his personal returns for these years wherein certain payments received from petitioner in the form of reimbursements for travel and entertainment expenses were reclassified as dividends. These reclassified dividends amounted to $4,405 in 1972 and $3,571 in 1973. Petitioner reported gross sales of $1,659,512 for the taxable period March 1 through December 31, 1972, and $2,182,814 for the taxable year ended December 31, 1973. *279 As reported on its federal income tax returns, petitioner's income before taxes for the above periods was $251,115 and $534,627, respectively, while its after-tax income for those periods was $137,888 and $284,890, respectively. Petitioner's earnings and profits during the years in issue were as follows: Accumulated Earnings
Current Earnings
Date
and Profits
and Profit
March 1, 1972 [13]
$1,410,051.52
$ 0
December 31, 1972
1,547,939.14
137,887.62
December 31, 1973
1,830,223.12
282,283.98
Petitioner's current assets, current liabilities and net working capital on December 31, 1972, and December 31, 1973, were as follows: 1972
1973
Current Assets
Cash
118,539
104,027
Certificates of Deposit
602,190
402,946
Accounts Receivable
155,731
193,379
Inventory
409,537
415,635
Receivable-Officers
22,357
55,497
Other Current Assets
4,422
18,829
Total Current Assets
1,312,776
1,190,313
Current Liabilities
Accounts Payable
154,692
134,488
Payroll Deductions
1,366
935
Accrued Operating
Expenses
50,288
65,405
Accrued Taxes
7,661
70,661
Total Current Liabilities
214,007
271,489
Net Working Capital
1,098,769
918,824
*280 The parties stipulated that petitioner's working capital needs for the taxable years ended December 31, 1972 and 1973, were $593,477 and $550,542, respectively. On October 15, 1975, respondent informed petitioner that a proposed statutory notice of deficiency for the taxable years ended December 31, 1972 and 1973, included amounts with respect to the accumulated earnings tax under section 531. [14] Petitioner timely submitted a statement, as provided in section 534(c), setting forth the grounds on which it relied to establish that all or part of its earnings had not been permitted to accumulate beyond the reasonable needs of the business. On February 26, 1976, respondent mailed a statutory notice of deficiency to petitioner in which respondent determined that petitioner was liable for the accumulated earnings tax imposed by section 531, in addition to income tax deficiencies for the two years in issue.[15] On February 7, 1979, this Court ruled that the burden or proof is on petitioner as to whether its earnings and profits were permitted to accumulate beyond the reasonble needs of its business. *281 OPINION The issue for decision is whether petitioner is liable for accumulated earnings taxes for 1972 and 1973. The accumulated earnings tax is imposed on those corporations formed or availed of for the purpose of avoiding tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed.Sec. 531. The existence of accumulations beyond the reasonable needs of the business is determinative that such a purpose exists unless the corporation can prove to the contrary by a preponderance of the evidence. Sec. 533(a). However, to the extent that a corporation retains all or any part of its earnings and profits to meet the reasonable needs of its business, such amounts are allowed as a credit against its accumulated taxable income which is subject to the accumulated earnings tax. Sec. 535. Whether a corporation has permitted its earnings and profits to accumulate beyond its reasonable needs is a question of fact to be determined by the conditions *282 existing in the year of the accumulation. Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. 566, 582 (1965). Events occurring in subsequent years are not determinative of the issue except to the extent that such events may shed light upon the facts as they may have existed in the year in issue. See Dixie, Inc. v. Commissioner, 31 T.C. 415, 426, 430 (1958), affd. 277 F. 2d 526 (2d Cir. 1960). In considering the factual issue, we recognize that in the first instance it is the responsibility of the corporate officers and directors to determine the reasonable needs of the business. Consequently, the judgment of corporate management is not to be ignored in determining whether the accumulations are beyond the corporation's reasonable needs. Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 329 (1968). Section 537(a)(1) specifically provides that reasonable needs of the business include "reasonably anticipated needs of the business." Section 1.537-1(b), Income Tax Regs., elaborates on the statutory *283 language: § 1.537-1 Reasonable needs of the business. * * *
(b) Reasonably anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. *284 (2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year.However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations. In other words, the regulations require the existence of a need to *285 accumulate plus a specific, definite and feasible plan to use the accumulation to satisfy that need. In a closely-held corporation, however, this plan does not have to be inscribed in formal minutes. John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 469 (1965). Instead, "the intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed purpose." Smoot Sand & Gravel Corp. v. Commission, 241 F. 2d 197, 202 (4th Cir. 1957), revg. a Memorandum Opinion of the Court. At the threshold, petitioner has requested the Court to reconsider its denial of petitioner's motion to shift the burden of proof to respondent purposant to section 534. [16] Petitioner has not brought to our attention any satisfactory reason why we should reconsider our original determination [17] and, accordingly, we adhere to our position. Moreover, we are of the opinion that the preponderance of the evidence in this case dictates the result we reach without the necessity of our relying on the niceties of burden of proof. [18]
*286 On the merits, the parties dispute the applicability of the accumulated earnings tax to petitioner for the taxable period ended December 31, 1972, and the calendar year 1973. The resolution of this issue depends on whether the reasonable needs of petitioner's business necessitated the accumulation of $505,292 as of December 31, 1972, and $368,280 as of December 31, 1973. These amounts represent the difference between petitioner's total available working capital on those dates and the stipulated corresponding working capital requirements of petitioner's business. [19] To the extent that this net liquidity is not absorbed by reasonable needs other than working capital, petitioner's current retained earnings in the years in issue ($137,888 in 1972 and $282,284 in 1973) will be exposed to the accumulated earnings tax. *287 Petitioner asserts that the accumulations in each year were justified to finance the expansion of its manufacturing operations. In the alternative, petitioner contends that it sustained its burden of proving that the accumulations were not intended to avoid income tax with respect to Richardson, its sole shareholder. On the other hand, respondent disputes (1) whether petitioner's reasonably anticipated needs included the need to expand its operations, (2) whether petitioner had specific, definite and feasible plans to utilize the accumulations allegedly held for expansion purposes and (3) whether petitioner's alleged plans warranted the amounts accumulated. The accumulated earnings tax is a penalty and, therefore, should be construed narrowly. Ivan Allen Co. v. United States, 422 U.S. 617, 626 (1975). Accordingly, we hesitate to attribute a tax avoidance motive to a taxpayer unless the facts and circumstances clearly warrant otherwise. John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 468 (1965). *288 In cases like the present one which involve closely or solely held corporations, we must balance our desire for evidentiary proof to substantiate the taxpayer's expansion plans with the reality that such corporations frequently operate in an informal manner. With this in mind, we proceed to assess the reasonableness of petitioner's accumulations. A. 1972
The proper point of reference used to determine the reasonableness of a given accumulation is the end of the taxable year in issue. The accumulation at the end of each year must be justified in its own right. Dixie, Inc. v. Commissioner, 31 T.C. 415, 426 (1958); sec. 1.537-1(b)(2), Income Tax Regs. After carefully reviewing the evidence, we are convinced that the reasonable needs of petitioner's business substantiated the accumulation of earnings and profits in excess of $505,292 as of December 31, 1972. This conclusion is based on a number of considerations. First, petitioner's reasonably anticipated needs included expansion of *289 its existing facilities. In 1972 petitioner's plant was operating at full capacity. It is reasonable to conclude that a company operating currently at full capacity will look to expand its operations. As previously mentioned, we will not readily substitute our business judgment for that of corporate management. See Magic Mart, Inc. v. Commissioner, 51 T.C. 775, 795 (1969). The decision to expand an existing business falls within this province of managerial discretion. In this case, there is a reasonable basis for its decision to expand. Respondent argues that petitioner has failed to prove its need to expand because it did not demonstrate that its West Brookfield facilities were deficient or inadequate, or that there existed a viable market for the increased production which would result from expansion. According to respondent, the magnitude of the expansion contemplated by petitioner would logically entail a more in-depth analysis of petitioner's need to expand and the potential success of any contemplated expansion program. Presumably respondent envisions some sort of engineering analysis of petitioner's existing facilities or a marketing survey, either *290 of which would substantiate petitioner's need to expand. Certainly respondent's approach would ease the evidentiary problems in a case like this, but that reason alone is not sufficient to require a closely or solely held corporation to act in a prescribed manner. Second, petitioner's expansion plans were sufficiently specific and definite to justify the accumulation of its earnings and profits. The source of this specificity and definitiveness is petitioner's actions just prior to, and subsequent to, December 31, 1972. As stated in Henry Van Hummell, Inc. v. Commissioner, 364 F. 2d 746, 750 (10th Cir. 1966), cert. denied 386 U.S. 956 (1967): The justification for the retention of earnings beyond the ordinary for anticipated particular purposes must be found in some clear action by the corporation. This would include the adoption of specific plans or programs. The purpose for retention thus must be expressed in some tangible way or by some action directed towards its fulfillment. See also Oklahoma Press Publishing Co. v. United States, 437 F. 2d 1275, 1277 (10th Cir. 1971); *291 Smoot Sand & Gravel Corp. v. Commissioner, 241 F. 2d 197, 202 (4th Cir. 1957). Petitioner's actions prior to December 31, 1972, clearly indicate that its expansion plans were not merely a mental conception possessed by Richardson. Cf. Atlantic Properties, Inc. v. Commissioner, 62 T.C. 644, 658 (1974), affd. 519 F. 2d 1233 (1st Cir. 1975). [20] In 1972 Richardson inspected a number of facilities in the southeast for the purpose of finding a suitable site for petitioner's expansion. By year's end Richardson had discovered the Allendale property and had determined that it was the best site available at that time. In fact, petitioner subsequently purchased the Allendale property on April 3, 1973, and in the following month it shipped equipment to that site. Subsequent actions, such as these, may not be ignored for they affect the weight to be given to the evidence of petitioner's intentions during the year in issue. See John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 469 (1965); sec. 1.537-1(b)(2), Income Tax Regs.[21]
*292 Respondent offers a two-prong argument against petitioner's compliance with the specificity requirements of section 1.537-1(b)(1), Income Tax Regs. First, respondent points to the non-existence of any documentation, i.e., corporate minutes, cost estimates, earning projections, or cash flow statements, which tends to establish that petitioner previously considered the acquisition of a new plant facility. Respondent, in his own brief, undercuts this argument when he correctly states: The specificity requirements were written into the regulations by the Commissioner precisely because a loosely run corporation presents a high potential for post hoc, unsupported rationalization for the unreasonable accumulation of profits. Bahan Textile Machinery Co. v. United States, 453 F.2d 1100, 1102 (4th Cir. 1972). In the absence of formally documented plans, the specific and definite plans must be manifested by some contemporaneous course of conduct directed toward the claimed purpose. Doug-Long, Inc. v. Commissioner, 72 T.C. No. 14 *293 (April 23, 1979). (Reply Br. at 25) In light of the above, it is difficult to reconcile respondent's concern for evidentiary documentation when he readily recognizes that contemporaneous actions may be an acceptable substitute. We are satisfied that petitioner's actions provide the tangible, objective evidence sought by the regulations. Respondent's second argument goes to our interpretation of petitioner's actions. Although respondent acknowledges that (1) Richardson inspected a number of sites during 1972, (2) petitioner eventually purchased the Allendale site and (3) petitioner purchased $35,000 of equipment which it shipped to the Allendale site, respondent contends that the Allendale site was acquired solely for the expansion plans of Gavitt Wire & Cable, a division of RSC Industries, ("RSC"). According to respondent, petitioner purchased the property for rental purposes and not for expansion purposes. This conclusion, however, is contrary to the facts of this case. The original investigation that uncovered the Allendale site was conducted by Richardson for the exclusive purpose of finding a suitable facility for petitioner's expansion plans. The foremost factor in *294 the decision to buy the property was its adaptability to petitioner's needs. Although it may be argued that petitioner would never have purchased the Allendale property without a commitment by a tenant to lease the excess space, this does not negate the fact that it was acquired to meet petitioner's expansion needs. Furthermore, the shipment of equipment by petitioner to Allendale tends to support petitioner's position that the site was intended for its own expansion. [22]
Third, the reasonable needs of petitioner's expansion plans justified the accumulation of $510,000 in earnings and profits as of December 31, 1972. As of that date petitioner had solidified its expansion plans to the point where it was reasonably anticipated that expenditures for the expansion would include the $475,000 subsequently spent to purchase the Allendale plant plus the $35,000 *295 subsequently spent to acquire equipment. In reaching this conclusion, we reject respondent's argument that petitioner should not be permitted to accumulate the entire Allendale purchase price because the size of the facility exceeded petitioner's expansion requirements. Respondent argues that, at most, petitioner should be permitted to accumulate a little more than one-half of the $475,000 cost of the Allendale property. We do not believe an apportionment is warranted in this case. We have found as a fact that petitioner's management believed that the Allendale facility was the best expansion site available at the end of 1972. [23] Furthermore, petitioner retained more than one-half of the Allendale plant for its own expansion plans. Where, as in the present case, a substantial portion of the property to be acquired is used for the reasonable needs of the taxpayer's business and the property is not among a number of equally acceptable alternatives, then it is reasonable to include the entire cost of the property in the computation of the taxpayer's reasonable needs.Respondent's approach *296 denies to a corporation the flexibility to which it is entitled in determining how best to satisfy the reasonable needs of its business. B. 1973
The question presented as to 1973 is whether the reasonably anticipated needs of petitioner's business, other than its working capital requirement, warranted the accumulation of $368,280 in earnings and profits as of December 31, 1973. Petitioner contends that it needed to accumulate $540,000 of earnings and profits in order to complete its expansion plans which included outfitting the Allendale site with equipment and inventory. On the other hand, respondent asserts that, as of December 31, 1973, petitioner had no specific, definite or feasible plans to justify the $540,000 accumulation. We agree with respondent. As with petitioner's 1972 plans, we are once again confronted with a total lack of documentation. However, unlike 1972, petitioner's actions do not provide an acceptable substitute for the missing documentation. Petitioner's expansion plans were suspended from August to December, 1973, while Handy & Harman's *297 proposed acquisition was pending. Petitioner claims that immediately after December 3, 1973, the cancellation date of the proposed acquisition, it actively resumed its expansion plans. These plans purportedly included the expenditure of $540,000 for equipment and inventory necessary to make the Allendale plant fully operational. The only evidence offered by petitioner to support both the need and the amount of this proposed expenditure was the testimony of Richardson, petitioner's sole shareholder during the years in issue. [24] An excerpt from that testimony, readily reveals the lack of specificity and definitiveness in petitioner's expansion plans as they existed on December 31, 1973: *298 Q. After the termination of the Handy and Harman negotiations on December 3, 1973, * * * at that point, did you have any thoughts after the negotiations with Handy and Harman as to what your plans were for the Allendale facility? A. Yes, I did. I was glad that we had discontinued all negotiations and felt free to go ahead with the plans we originally had for Brookfield Wire Company. * * *
Q. Did you [previously] state, that after the conclusion of the Handy and Harman negotiations, that you had no plans whatsoever from then till the balance of the end of 1973, as to what your plans were for the Allendale facility * * *. A. Well, I had no discussions with anyone, but I certainly hadn't given up my plans. As I said, I was relieved, after all of the time of pressure, that the deals were off, and that I was free to operate. As a matter of fact, I think most of my time was spent after that in relaxing for the balance of the year. I certainly was considering expansion in the back of my mind, and we were going ahead with the expansion plans in my point of view. Q. Is it not true that from December 3, 1973, until the balance of 1973, that you had no specific plans *299 as to expansion of Allendale facility? A. No I wouldn't say that's true that we had no specific plans. We certainly had intentions that we would continue the operation and continue to go forward, but I had finalized no plans at that time. But we were just picking up where we had left off before the merger talks began. [25]
The specificity requirements of the regulations are not satisfied by "back-of-the-mind" plans; there must be something more than a mental conception of a plan by petitioner's sole shareholder for us *300 to conclude that the alleged plan justified the amount accumulated. See Atlantic Properties, Inc. v. Commissioner, 62 T.C. 644, 658 (1974), affd. 519 F. 2d 1233 (1st Cir. 1975). [26] Without some corroborative, contemporaneous evidence, "a loosely run corporation like [petitioner] presents a high potential for post hoc, unsupported rationalizations for the prohibited hoarding of profits." Bahan Textile Machinery Co. v. United States, 453 F. 2d 1100, 1102 (4th Cir. 1972). Petitioner introduced no contemporaneous documentation or analyses indicating what equipment, if any, was needed to meet its expansion needs; nor did it introduce any contemporaneous cost estimates for that equipment. [27] In the absence of any other evidence, we do not believe that Richardson's testimony, rendered five years after the year in issue, satisfies the specificity requirement of the regulations, sec. 1.537-1(a)(2), Income Tax Regs., [28] and, accordingly, we conclude that petitioner's $540,000 accumulation was unjustified. [29]
*301 Despite our conclusion that the $540,000 represented an unreasonable accumulation of earnings and profits and the presumption arising therefrom (see sec. 533), petitioner may still avoid the imposition of the accumulated earnings tax by proving, by the preponderance of the evidence, that tax avoidance motives did not contribute to the decision to accumulate. United States v. Donruss Co.,393 U.S. 297, 309 (1969); sec. 1.533-1(a)(1), Income Tax Regs. Petitioner points to three factors which it claims sufficiently demonstrate the absence of the requisite intent to avoid shareholder taxes. These factors are: (1) the increase in Richardson's annual salary from $40,000 to $70,000 upon his reacquisition of petitioner and the $1,000 increase in the monthly airplane rental paid by petitioner to Richardson; (2) Richardson's prompt repayment history on loans made to him by petitioner; and (3) petitioner's dividend payout history which reflects $1,400,000 of dividends paid between 1966 and 1972. On closer analysis, we find these factors unconvincing. The payment of a large salary to the sole shareholder generally indicates the absence of the *302 intent to avoid shareholder taxes. See Bremerton Sun Publishing Co. v. Commissioner, 44 T.C. 566, 588 (1965). However, in this case we believe the increase in Richardson's remuneration merely served to offset the loss of dividend income previously derived from The Williams Company's preferred stock which Richardson surrendered in order to reacquire petitioner. Not coincidentally, the lost dividend income approximated $42,000 annually. The existence of loans to the sole shareholder generally indicates the presence of the requisite intent to avoid shareholder taxes. Cf. Bremerton Sun Publishing Co. v. Commissioner, supra; sec. 1.533-1(a)(2)(i), Income Tax Regs. Therefore, at best, Richardson's prompt payment of his loans neutralizes what would otherwise be a negative factor. A good dividend history generally indicates the absence of the proscribed purpose to avoid shareholder taxes. See Bremerton Sun Publishing Co. v. Commissioner, supra; *303 sec. 1.533-1(a)(2)(iii), Income Tax Regs. While the payment of $1,400,000 in dividends over a six-year period might otherwise be a favorable factor, the significance of these payments is minimized when it is observed that these dividends were paid during the period petitioner was controlled by either Edgcomb Steel Company or The Williams Company, both publicly-held corporations. Petitioner neither declared nor paid any dividends during the periods 1951 to 1963 or March 1, 1972 to December 31, 1973, at which times it was controlled by Richardson. In light of these facts, we attribute a negative inference to petitioner's dividend history. Without more, we would conclude that petitioner has clearly failed to rebut the presumption created by its unreasonable accumulation in 1973.There are, however, two other factors which when coupled with the loans to Richardson and petitioner's non-existent dividend history during Richardson's control convinces us that the purpose behind the 1973 accumulation was to avoid shareholder taxes. The first factor is Richardson's 1973 marginal tax rate of 50%. It is obvious that Richardson saved a large amount of income tax *304 in 1973 by having petitioner's earnings accumulated rather than distributed. See Battelstein Investment Co. v. United States, 302 F. Supp. 320, 331 (S.D. Tex. 1969), affd. 442 F. 2d 87 (5th Cir. 1971). The significance of that tax savings is highlighted by the second factor, the $1,000,000 redemption of 200 shares held by Richardson in April 1974.[30] Since Richardson presumably reported the gain from the redemption as a capital gain, he saved a substantial amount of taxes by temporarily postponing the distribution of petitioner's 1973 earnings and profits. In sum, we find that, in 1973, petitioner was formed or availed of for the purpose of avoiding income tax with respect to its sole shareholder and, consequently, petitioner is subject to the accumulated earnings tax. One minor, but lingering, dispute between the parties concerns the amount of the dividends paid deduction to which petitioner is entitled. Petitioner contends that it should receive a dividends paid deduction in 1973 of $5,004.96 which represents the amount of *305 travel and entertainment expenses disallowed on petitioner's 1973 tax return. On the other hand, respondent contends that petitioner should receive a dividends paid deduction to the extent the disallowed expenses were taxed as constructive dividends to Richardson, i.e., $3,571.00. The purpose of the accumulated earnings tax is to force a corporation to distribute any profits not required to conduct its business so that upon distribution the shareholders of the corporation will become liable for the taxes on the dividends received. United States v. Donruss Co.,393 U.S. 297, 303 (1969). In light of this purpose, we accept respondent's treatment of the dividends paid deduction. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioner's 1972 taxable year ran from March 1 to December 31, 1972.↩
2. Petitioner thus became a second tier subsidiary of Williams.↩
3. Evidently Richardson disposed of 20,000 shares of the preferred stock sometime between 1969 and 1971.↩
4. This dividend was part of the three step exchange between Williams and Richardson.↩
5. The Allendale facility was approximately twice as large as petitioner's West Brookfield plant. ↩
6. Gavitt's operations were housed in buildings located in Brookfield and West Brokfield, Massachusetts. The age and physical separation of these buildings impaired production efficiency.↩
7. Richardson had been initially approached by Handy & Harman in March 1973. ↩
8. At the same time, but in a separate transaction, Handy & Harman proposed a merger between itself and RSC. It appears that Handy & Harman's interest in acquiring petitioner from Richardson was the result of the merger plans with RSC. Petitioner and RSC were competitors to a certain extent. Insofar as Richardson would become a shareholder of Handy & Harman after the merger due to his holdings in RSC, Handy & Harman apparently wanted to prevent Richardson from remaining a shareholder of a competitor.↩
9. Although petitioner's acquisition by Handy & Harman was dependent on the successful merger of the latter with RSC, it was possible albeit improbable under the stock purchase agreement for the sale of petitioner's stock not to occur despite the occurrence of the merger. This possibility, which potentially could have disrupted the existing relationship between petitioner and RSC, moved the two parties to formalize their lease arrangement. ↩
10. In addition, the lease provided that all taxes and insurance expenses would be paid by petitioner; that petitioner would pay its allocable portion of the utility expenses; and that any alterations or improvements made by the tenant would be forfeitable to petitioner without compensation upon the lease's termination.↩
11. The property had been similarly categorized in the financial statements of August 31, 1973, which were mandated as part of the defunct stock purchase agreement between Richardson and Handy & Harman.↩
12. Richardson received $943,048.52 in cash and $56,951.48 as a loan cancellation.↩
13. Richardson reacquired petitioner's common stock as of March 1, 1972.↩
14. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue. ↩
15. By stipulation the parties settled all the contested issues other than those relating to the accumulated earnings tax.↩
16. Section 534 provides in pertinent part: (a) General Rule.--In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall-- (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.
(b) Notification by Secretary.--Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. (c) Statement by Taxpayer.--Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. * * *↩
17. We based our original determination on petitioner's vague and unsupported assertion that the accumulations were for its "far reaching expansion and geographical diversification program." Petitioner provided no information about the origin or the need for its program. The bare assertion of the need to expand and/or diversify without sufficient facts to support that contention is not adequate to shift the burden of proof. See Wellman Operating Corp. v. Commissioner, 33 T.C. 162, 184-185 (1959); I.A. Dress Co. v. Commissioner, 32 T.C. 93, 100 (1959), affd. 273 F. 2d 543 (2d Cir. 1960). Furthermore, petitioner's statement pursuant to section 534(c) did not cover both years in issue. The statement only revealed activities related to 1973, i.e.,↩ the purchase of the Allendale site, the purchase of equipment to be used at that site, and the negotiations to purchase Howmet. Petitioner did not demonstrate how these activities related to its 1972 accumulations. 18. Another preliminary matter raised by petitioner deals with two pieces of evidence submitted by respondent. The two items are petitioner's December 31, 1973 audited financial statements and a registration statement (Form S-14) filed by Hardy & Harman for the purpose of registering those shares of stock which would have been used in the proposed transactions involving RSC and petitioner. Respondent introduced these documents to shed light on the relationship between petitioner's operations and the Allendale facility. Petitioner, however, argues that the documents are irrelevant. We do not agree. While the documents represent the opinion of parties other than petitioner, the authors of the documents provide objective, contemporary views of petitioner's relationship to the Allendale site.We find these statements to be relevant as to whether, and to what extent, petitioner had plans to expand.See F.R. Evid. 401↩.
19. We reject petitioner's argument that all accumulations prior to March 1, 1972, should be ignored for purposes of determining the reasonableness of petitioner's accumulation of earnings and profits in 1972 and 1973. (March 1, 1972, was the date on which Richardson reacquired sole ownership of petitioner from The Williams Company, a publicly-held corporation.) Petitioner's argument is premised on its belief that the accumulated earnings tax is not applicable to either publicly-held corporations or wholly-owned subsidiaries of such corporations. The apparent thrust of petitioner's argument lies in its belief that "it would be extremely harsh and unfair to impose the section 531 accumulated earnings tax upon a corporation such as petitioner, which had gone from being a wholly-owned subsidiary of a publicly-held corporation to a closely held corporation, as a result of the earnings and profits accumulated by the corporation during its ownership by the publicly-held corporation." Without commenting on the validity of petitioner's underlying assumption, i.e., the accumulated earnings tax does not apply to publicly-held corporations or their subsidiaries, we reject petitioner's contention. Petitioner apparently has an erroneous perception of the principles underlying the imposition of the accumulated earnings tax. The tax applies to the current accumulations of earnings and profits, sec. 535 (a); it is not a tax on prior accumulations of earnings and profits. Prior accumulations of earnings and profits affect the computation of the tax only insofar as they have not been used to purchase plant, equipment or other non-liquid assets. See Smoot Sand & Gravel Corp. v. Commissioner, 274 F. 2d 495, 500-501 (4th Cir. 1960), cert. denied 362 U.S. 976 (1960).This is because prior accumulations held in the form of liquid assets are available to meet the reasonable needs of the business thereby potentially exposing current accumulations to the tax. See sec. 1.535-3(b)(1)(ii), Income Tax Regs. If we were to ignore the pre-March 1, 1972 accumulations we would, in essence, be saying that those accumulations were not available to meet the needs of petitioner's business. That assertion, however, is simply not true since both prior and current accumulations are equally expendable on business needs so long as they are held as liquid assets. Petitioner presents another unpersuasive argument for disregarding prior earnings and profits. Petitioner contends that a portion of its prior earnings and profits were transformed into capital on March 1, 1972, because the consideration paid by Richardson exceeded petitioner's net book value. Petitioner offers no support for this novel theory of corporate taxation and accounting. This is not surprising since it is antithetical to the general proposition that the sale of stock by a shareholder does not affect the earnings and profits of a corporation.↩
20. See also Cadillac Textile, Inc. v. Commissioner, 34 T.C.M. 295↩, 44 P-H T.C. Memo. par. 75,046 (1975). 21. See also Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 333 (1968), wherein we stated: [The] courts primarily take into account evidence of actual implementation in evaluating the specificity of plans as they existed during the critical period, provided that some evidence of plans is adduced. [Cites omitted.]↩
22. Respondent nonchalantly dismisses this factor by saying it does not establish that petitioner actually planned to commence operations at Allendale. Instead, respondent contends that petitioner's equipment was placed in Allendale so that it could be used by RSC. The record, however, does not support this contention.↩
23. There is no evidence that Allendale was among a number of equally acceptable alternative locations.↩
24. During his direct testimony, Richardson named various machines and equipment which, in his opinion, were necessary to acquire in order to complete the Allendale expansion. He then proceeded to estimate the 1973 cost of these items. The total cost of this equipment and machinery approximated $500,000. Additionally, Richardson estimated that the Allendale plant required $40,000 worth of raw wire inventory. Therefore, Richardson concluded that a total accumulation of $540,000 was required as of December 31, 1973.↩
25. On brief petitioner summarizes its view of Richardson's testimony as follows: Although the petitioner's expansion plans were not extensively documented through corporate minutes and the like and were not exhaustively discussed between all of petitioner's directors, they did exist as real, specific, definite and feasible plans inthemind↩ of Richardson, petitioner's sole shareholder, President, director and driving force behind petitioner's operations and success, as fully disclosed by Richardson's uncontradicted testimony. (Emphasis added.)
26. See also Cadillac Textiles, Inc. v. Commissioner, 34 T.C.M. 295↩, 44 P-H T.C. Memo. par. 75,046 (1975). 27. Richardson testified that he contacted a number of used machine verdors in December 1973, or January 1974, in order to price a rod breakdown machine. We find this portion of his testimony incredible in that (1) it is inconsistent with his testimony that, as of December 31, 1973, he had not acted upon the expansion plans, and (2) it makes no sense that he would price machinery in 1974 when, at that time, he had advised Hoskins Manufacturing Company, a potential acquirer of petitioner, that the Allendale facility was going to be acquired by RSC. ↩
28. The lack of any specific or definite plans also precludes us from determining that some lesser amount was reasonably accumulated. ↩
29. Moreover, we find Richardson's listing and pricing of machinery and equipment on direct examination to be inconsistent with the vague and indefinite status of the expansion plans evidenced by the except from his cross-examination. This gives us cause to believe that Richardson's $540,000 estimate represents a post hoc rationalization for the accumulation of earnings and profits. Petitioner did not subsequently acquire the machinery, equipment or inventory for the Allendale plant. Furthermore, RSC, by virtue of its option, purchased the entire Allendale facility in March 1974.↩
30. The redemption was part of the arrangement whereby Hoskins Manufacturing Company acquired petitioner in 1974.↩